[No. 32516. *En Banc.* October 1, 1953.]

K. L. PARTLOW *et al., Respondents,* v. FRANK P. MATHEWS, *Appellant.*[1]

[1]Reported in 261 P. (2d) 394.

[REDACTED]

*Brodie, Brodie & Fristoe,* for appellant.

*O'Leary, Meyer & O'Leary,* for respondents.

SCHWELLENBACH, J.—This is an appeal from a judgment enforcing a restrictive clause in a partnership agreement.

Some time prior to 1949, a group of doctors in Olympia conceived the idea of organizing a clinic and of constructing and equipping a building for that purpose. They contacted other doctors with the view of having them associate in the venture. The original members organized the Des Chutes Investment Corporation, which purchased real estate, and erected and equipped a building, at an approximate expenditure of five hundred thousand dollars.

July 29, 1949, a partnership agreement was entered into, forming the Memorial Clinic, and signed by the following doctors: K. L. Partlow, T. R. Ingham, M. R. Hunter, Van Sim, and Keith Cameron, as original partners, and Jean M. Burkhart, William L. Lightburne, K. L. Partlow II, Philip R. Vandeman, and Frank P. Mathews, as associate partners.

Dr. Mathews was stationed at Seattle during World War II. After the war, he returned to the East and was associated with the Yale University medical school. He wrote to a medical bureau in Chicago asking if there were any openings for internes in the Seattle area. He was advised of the proposed clinic and came to Olympia in 1948 to contact the organizers. After several conferences, he decided to come out here and join the partnership. Attached to the origi-

nal agreement was a special agreement concerning Dr. Mathews:

"MEMORIAL CLINIC PARTNERSHIP AGREEMENT

"This document is a portion of the Memorial Clinic Partnership Agreement and its purpose is to set forth the special stipulations controlling the relations of Frank P. Mathews, an associate partner, to the partnership, in addition to the provisions and stipulations of the principal partnership agreement.

"1. *Withdrawal*: Frank P. Mathews may withdraw from the partnership by giving a three-month written notice of his intention to withdraw to the executive committee of the partnership. In the event that the executive committee requests him to revoke his notice of withdrawal prior to the effective date thereof, and he refuses to comply with such request, his withdrawal shall become effective and shall be subject to the following conditions:

"(a) He shall not engage in the practice of medicine or surgery in a location within a twenty-five mile radius of the City of Olympia, Washington."

Some time in 1950, he became dissatisfied with the arrangement, feeling that his salary and participation in the profits should be more generous. September 6, 1950, he wrote the following letter:

"The Executive Committee September 6, 1950
Memorial Clinic
Olympia, Washington
"Gentlemen:

"By the terms of my initial partnership agreement with the Clinic I was to have, after one year of active participation as an Associate Partner, an opportunity to meet with the Executive Committee to discuss revision of my present share in the proceeds of this enterprise. This has been to date 40% of a share, or $600.00 a month, whichever was the greater.

"To determine what would be a fair increment of my income at the present, I have made the following calculations:

"MONTHLY GROSS INCOME FOR FIRST YEAR OF OPERATION

| "Sept. 1949 | $829.90 | (One-fourth of 1949 total) |
|---|---|---|
| Oct. 1949 | 829.90 | " |
| Nov. 1949 | 829.90 | " |
| Dec. 1949 | 829.90 | " |
| Jan. 1950 | 1,280.15 | |
| Feb. 1950 | 996.45 | |
| Mch. 1950 | 1,523.10 | |

| Apr. 1950 | 1,500.80 | |
| May 1950 | 1,528.75 | |
| June 1950 | 1,125.75 | (Vacation) |
| July 1950 | 1,326.30 | |
| *Aug. 1950 | 1,293.85 | (Estimated by extrapolation) |

| | $13,894.75 | |
| Yearly net | $7,200.00 | |
| Yearly overhead: | | $6,694.75, or *93% of net.* |

"Recent surveys indicate that the average overhead of independent practitioners is about 40% of net income.

" * 1950 figures include credit for one-half of the x-ray fee on my gastrointestinal radiological work.

"There is a stipulation in my agreement with the clinic to the effect that should I leave the clinic I would not be permitted to practice medicine within 25 miles of Olympia. Since this seriously impairs my bargaining power in asking for a raise, I have asked my lawyer about this.

"My lawyer is almost sure that this stipulation is nonenforceable, on a technicality. The point can be settled any time by getting a court Declaratory Judgment, or permanent interpretation of this clause in the contract.

"To save the clinic an embarrassment and a nuisance, and to save me legal fees, I would appreciate a formal cancellation of this 25 mile no-practice clause.

"To summarize, in view of my formidable share of the overhead of the clinic, and in view of the healthy increase month by month in my gross income, I feel very strongly that, starting as of September 1, 1950, I am worth $900.00 a month, or 75% of a share, whichever is the greater.

"(Signed) Frank P. Mathews, M. D."

As a result of this letter, a rather extensive amendment to the partnership agreement was entered into on September 18, 1950. It set up three classifications, (1) senior partner, (2) junior partner, and (3) associate partner. It made salary adjustments and also liberalized the provisions with respect to capital investment requirements. It also made changes as to participation of assets on withdrawal. It provided that "voluntary withdrawal" should be divided into two sections, "approved voluntary withdrawal" and "unapproved voluntary withdrawal." It provided that the decision as to whether such withdrawal be approved or unapproved should rest solely with the management committee. It stated that if

a member, for personal reasons not acceptable to the management committee, merely wished to sever his relationship with the partnership, such withdrawal would fall into the unapproved withdrawal classification.

The amendment provided that a partner making an unapproved withdrawal would be entitled to fifty per cent of his capital investment or equity in the general partnership, and provided the manner in which such payment should be made. This amendment to the partnership agreement was signed by all of the partners, including Dr. Mathews.

November 1, 1951, Dr. Mathews wrote the following letter:

"T. R. Ingham, M. D.
Chairman, Management Committee
Memorial Clinic
529 West 4th Avenue
Olympia, Washington
"Dear Reed:

"Pursuant to the provisions of Exhibit B, which is the specific contract between the Memorial Clinic partnership and the undersigned, I hereby notify the Management Committee of my intention to withdraw from the partnership. This withdrawal is to become effective ninety days from this date in accordance with the provisions of Exhibit B.
"FPM: J · Yours sincerely,
 [signed]
 Frank P. Mathews, M.D.
"cc: Dr. J. M. Burkhart
 Dr. T. R. Hazelrigg
 Mr. T. S. Hough
 Mr. Doane Brodie, Atty.
"Dated at Olympia, Washington
 November 1, 1951
"Receipt of original of this notice
acknowledged, November 1, 1951, by

............................................................................................
Partner, Memorial Clinic"

As a result of this notice of intention to withdraw, a general meeting of the members of the partnership, including Dr. Mathews, was held, November 20, 1951. A motion was made and seconded that Dr. Mathews rescind his notice of withdrawal. The minutes show that this motion was approved unanimously.

January 16, 1952, Dr. Mathews wrote another letter to Dr. Ingham, notifying him of his intention to withdraw. With the exception of the dates, the letters of November 1, 1951, and of January 16, 1952, are identical.

February 2, 1952, Dr. Mathews commenced action in the superior court for Thurston county, seeking a declaratory judgment concerning his rights under the restrictive clause of the partnership agreement. In his complaint, he alleged that since the service of the notice of January 16, 1952, he had been notified by the partners to retract his notice of intention to withdraw. This allegation was denied by the defendant partners in their answer. In his reply, dated April 18, 1952, Dr. Mathews admitted that the defendant partners had not orally or in writing notified him to retract his notice of intention to withdraw, and prayed that the action be dismissed without prejudice. The action was dismissed June 15, 1952.

No formal action on the second notice of withdrawal was taken by the executive committee or by the partnership. Dr. Ingham, the chairman of the executive committee (the other two members being Dr. Burkhart and Dr. Hazelrigg), testified:

"Q. And did you speak to Dr. Mathews about this notice of withdrawal he had given you? A. Yes. I expressed great surprise in view of the fact that we had just completed the signing of a new agreement that I thought had been drawn very carefully to suit many of his desires, and we had just completed providing a leave of absence for him at our expense for some post graduate study, and I believe I made it quite clear to him that we wanted him to withdraw that notice right now; that we didn't want him to leave and we could not approve of his leaving. I pointed out to him that I was speaking as an individual, that I was also the Chairman of the Board and I knew that was the way every doctor in our group felt about the matter. Q. Did you explain to him or discuss with him the matter of treatment of patients that requires his specialty in the Clinic in the event he was to leave? A. Yes. I pointed out that we were short of help in internal medicine, that we were overburdened with the same and that his presence was most necessary to us. Q. What was Dr. Mathews' response to your discussion, to your state-

ments to him? A. Well, frankly, I don't recall that he gave much of an answer to the subject. I asked him repeatedly what his desires really were and I don't recall that I got a straight answer. Q. Did you at that time or any time subsequent give him notice to come to the meetings of the partnership to discuss the matter? A. Yes. We had several meetings after that date and on one particular occasion had a general meeting. We made it a point to do our best to get him to come to the general meeting and I was told he had his lunch with him and ate his lunch in the car rather than attend our meetings. Q. How often did you hold these meetings? A. We had a general meeting once a month and management meetings were had in between and at which all members were welcome to attend. Q. After the 16th of January, 1952, as a matter of fact, did Dr. Mathews attend any of the meetings of either the management meetings or the general meetings? A. No, sir. Q. Now, did Dr. Mathews take any action, any legal action of any kind after he gave his notice to you on January 16th that he intended to withdraw? A. Yes, we were served with a notice to appear in court and to defend ourselves on a charge regarding the validity of the restriction clause in case he should leave our Clinic."

Dr. Ingham also testified that he saw Dr. Mathews about 5: 15 on the evening of April 15th, and that Dr. Mathews told him that the ninety days had elapsed and that there was nothing the partnership could do about the restrictive clause. His testimony continued: "He stated that is why he hadn't attended the meetings and made it a point not to have a discussion with me for fear that I would make an official request for him to rejoin the Clinic, and therefore influence his restriction clause." Dr. Mathews remained at the clinic during the ninety day period, but avoided the other members.

April 15th, the committee wrote the following letter:

"April 15, 1952
NOTICE
"To FRANK P. MATHEWS, M. D.
Memorial Clinic
Olympia, Washington

"Please be advised that the Management Committe of the Memorial Clinic has heretofore considered your notice of withdrawal and accepted the same, that the Management Committee has classified such withdrawal as 'an unapproved

voluntary withdrawal' as per sub-paragraph (b) of paragraph 1 of that section of the amendment to partnership agreement entitled, 'Participation of Assets on Withdrawal.'

"By the terms of this agreement and by the nature of your withdrawal, you are entitled to fifty per cent of your equity in the general co-partnership, which is to be paid at the rate of twenty-five per cent within thirty days, the balance to be paid at the rate of fifty per cent of your monthly salary until the indebtedness has been paid in full. " . . .

"Please be further advised that you will no longer be associated with the Memorial Clinic after five o'clock on the evening of the 16th of April, 1952, and that as per the present litigation in the Superior Court of the State of Washington for Thurston County, Cause No. 26521, we shall invoke sub-paragraph (a) of paragraph 1 of Exhibit 'A' of the original Memorial Clinic partnership agreement, which sub-paragraph prohibits your practicing medicine 'within a twenty-five mile radius of the City of Olympia, Washington.'

"MEMORIAL CLINIC
By *Thos. R. Ingham* [signed]
*J. M. Burkhart MD* [signed]
*Thomas R. Hazelrigg* [signed]
Management Committee"

Later, Dr. Mathews opened an office in the Security Building in Olympia, and this action was commenced by the partners, seeking to restrain him from practicing within twenty-five miles from Olympia, as provided in the restrictive clause, and asking for damages. Defendant answered, one of his allegations being that the partners had failed to perfect their right to invoke the covenant not to compete within a radius of twenty-five miles. He also counterclaimed for an additional twenty-five per cent of his capital investment or equity, claiming that his withdrawal should be considered as an approved voluntary withdrawal.

The trial court found that no formal request was made to revoke the second notice of withdrawal, but that defendant had definitely made up his mind to withdraw and would not have retracted, had he been formally requested to do so; that the restriction of practice within a twenty-five mile radius of Olympia is unreasonable, but that it is reasonable to restrict his practice in the cities of Olympia, Yelm, or Tum-

water or at any place within a radius of twenty-five miles from the city of Olympia in Thurston county; and that there was no proof of monetary damages.

Judgment was entered restricting the defendant from practicing within that portion of Thurston county, within a twenty-five mile radius of Olympia, and dismissing the cross-complaint. This appeal follows.

It is appellant's contention that the giving of a request to revoke the notice of withdrawal by the executive committee of the partnership was a condition precedent to their right to invoke the provisions of the restrictive covenant against practice within a twenty-five mile radius of Olympia.

■ A condition precedent is such as must happen or be performed before a right can accrue to enforce an obligation dependent upon the happening or performance thereof against another in favor of one claiming such right. *Cozby v. Edwards,* 203 S. W. (2d) (Texas Civ. App.) 569. Conditions precedent to a recovery under a contract are usually created by such phrases as "on condition", or "provided that", or "so that", and the like. But such expressions are not necessary if the contract is of such a nature as to show that the parties intended to provide for a condition precedent. *Globe American Corp. v. Miller Hatcheries,* 110 S. W. (2d) (Mo. App.) 393. The parties to a contract are at liberty to agree upon a condition precedent upon which liability shall depend. Whether the doing of an act is a condition precedent depends, not on any hard and fast rule, but on the intention of the parties as deduced from the whole instrument. 12 Am. Jur. 849, Contracts, § 296.

Under the provisions of the agreement in the case at bar, what were the rights, duties and liabilities of the parties after appellant, on January 16, 1952, gave his notice of intention to withdraw? Appellant (1) could have withdrawn his notice prior to the expiration period and thus could have remained in the partnership, unless respondents, within such period, had accepted his notice of withdrawal. (2) He could have withdrawn at the expiration date if respondents had not asked him to revoke his notice. (3) If,

prior to the expiration date, respondents had asked him to revoke his notice of withdrawal, he would have had two alternatives; he could have revoked his notice and remained in the partnership, or he could have refused to revoke and could have withdrawn at the expiration date. However, in that event, his withdrawal would have been subject to the restrictive clause.

Respondents (1) could have accepted his notice of withdrawal within the three months' period, thus preventing him from changing his mind. (2) They could have remained silent, and, if he did not voluntarily revoke his intention within the three months' period, his withdrawal would have become effective on the expiration date. (3) They could have requested him to revoke his notice of withdrawal prior to its effective date, and, if he refused to do so, his withdrawal would have been subject to the restrictive clause.

We are satisfied, from the record, that the parties clearly understood their rights, duties, and liabilities under the agreement. Appellant, on November 1, 1951, gave his notice of intention to withdraw. November 20, 1951, respondents asked him to revoke his notice. Appellant was faced with this dilemma. He wanted to withdraw, but he did not want his withdrawal to be subject to the restrictive clause. So, on January 16, 1952, he tried again. His second notice was identical in language with the first one. Then, in order to prevent respondents from again asking him to revoke his notice, he avoided them. Although respondents were sincere in their desire to retain him in the partnership, they finally became convinced that he did not wish to remain and, on April 15, 1952, accepted his withdrawal. In doing so, however, they lost their right to invoke the restrictive clause.

Paragraph 11 of the original partnership agreement covered very fully the subject of the withdrawal of the partners. However, a special agreement was entered into covering the subject of the withdrawal of appellant, which we repeat:

". . . In the event that the executive committee requests him to revoke his notice of withdrawal prior to the effective date thereof, and he refuses to comply with such request, his withdrawal shall become effective and shall be subject to the following conditions:

"(a) He shall not engage in the practice of medicine or surgery in a location within a twenty-five mile radius of the City of Olympia, Washington."

 All of the parties to the agreement, by their conduct after the first notice was given, interpreted the above provision as a condition precedent. It is clear to us that, when the partners executed the special agreement with appellant, it was the intention of the parties that, before the respondents could enforce the restrictive covenant, it was incumbent upon the executive committee to request appellant to revoke his notice of intention to withdraw, followed by his refusal to do so. The performance of such act by the executive committee was a condition precedent to the right of respondents to invoke the restrictive clause.

 The trial court found that appellant had definitely made up his mind to withdraw and that he would not have retracted had he been requested to do so. The court concluded that a request to retract would therefore have been useless and was unnecessary. Appellant had a right to withdraw, and his intention is immaterial to the issue before us.

*State ex rel. Brown v. Gannon,* 10 Wn. (2d) 440, 117 P. (2d) 215, was an action in mandamus to compel the granting of a life diploma. The relator, a schoolteacher, sought to compel the board of regents of Washington State College to issue the diploma to him. Rem. Rev. Stat., § 4599, provided:

"The said board is also empowered, upon recommendation of the faculty, to grant normal diplomas which shall entitle the holder to teach in any public school in the state for a period of five years; and to grant life diplomas to candidates who shall give satisfactory evidence of having taught successfully for twenty-four (24) months: . . ."

Relator had complied with all the conditions of the statute except that he had not obtained any recommendation of the

faculty. In affirming a judgment dismissing the action, we said:

"A faculty recommendation, not merely a demand upon the faculty therefor, is a condition precedent to appellant's right to the issuance of a life diploma by the board of regents. The performance of the condition may not be excused simply because demand has been made and has been refused, or because the making of a demand would be useless."

Appellant's cross-complaint was without merit. Clearly, from the evidence his withdrawal falls into the unapproved withdrawal classification as provided in the amendment to the partnership agreement. Furthermore, the management committee, which had the sole power to determine that question, so decided.

That portion of the judgment dismissing the cross-complaint is affirmed. It is, in all other respects, reversed, and the cause is remanded to the trial court with direction to dismiss respondents' complaint.

GRADY, C. J., MALLERY, HILL, WEAVER, and OLSON, JJ., concur.

HAMLEY, DONWORTH, and FINLEY, JJ., did not participate.

November 5, 1953. Petition for rehearing denied.