[No. 10708–9–I.   Division One.   March 5, 1984.]

ARTHUR LANGSTON, ET AL, *Appellants,* BAYSHORE REALTY, INC., *Respondent,* v. DONNA HUFFACKER, ET AL, *Respondents.*

*Lagerquist & McConnell, Inc., P.S., Robert A. McConnell,* and *Thomas F. McDonough,* for appellants.

*Linde, Boyer & Mashita, P.S.,* and *Lloyd Mashita,* for respondent Bayshore Realty.

*Cartano, Botzer, Larson & Birkholz* and *Paul W. Oden,* for respondents Huffacker.

SCHOLFIELD, J.—Langston and Anderson (hereafter Langston, the purchaser) appeal denial of their claim for specific performance of a real estate purchase and sale agreement involving a building lot. Donna Huffacker, owner of the lot, appeals an award of a real estate commission and attorney's fees to Bayshore Realty, Inc. (hereafter Bayshore). Bayshore appeals denial of its claim for prejudgment interest on its commission. We reverse, remand for an order granting specific performance, affirm the trial court's award of the real estate commission and attorney's fees, and reverse the denial of prejudgment interest.

Lot 7, Westcott Bay Park, San Juan County, was purchased by Dr. Ernest M. Burgess in April 1968 from Roche Harbor Lime and Cement Company. Metropolitan Federal Savings and Loan Association held a security interest through a deed of trust granted by Roche Harbor on the Westcott Bay Park subdivision, including lot 7, in the amount of $1,700,000. Roche Harbor also assigned the vendor's interest in the real estate contract with Dr. Burgess to Metropolitan.

In 1974, Dr. Burgess quitclaimed his interest in lot 7 to his daughter, Huffacker, who lived in Illinois. Huffacker, in

turn, agreed to sell to Langston in 1980. All matters relating to the sale to Langston were handled by Dr. Burgess pursuant to a written power of attorney from Huffacker dated January 10, 1980.

Dr. Burgess signed an Exclusive Listing Agreement with Bayshore Realty dated March 12, 1980, granting to Bayshore for a term of 4 months "the sole and exclusive right to submit offers of purchase, and to sell, and to receipt for deposit in connection therewith, [lot 7]". Exhibit 1. The listing agreement provided in paragraph 4 as follows:

IV. EXTENSION OF THIS AGREEMENT.

If the seller, during the period of this agreement, accepts any offer to purchase the premises, and the sale pursuant to said acceptance fails to close for any reason whatsoever, the term of this agreement shall continue from the effective date hereof until thirty (30) days after the expiration date, or 30 days after the date upon which the earnest money is forfeited or refunded, whichever is later.

Exhibit 1. The seller (Huffacker) agreed to pay a commission of 10 percent of the selling price when "[a]gent procures an offer to purchase on the terms set forth herein, or on other terms acceptable to the seller." Exhibit 1.

The listing agreement also provided for reasonable attorney's fees in the event Bayshore successfully employed an attorney to enforce the agreement.

A Real Estate Purchase and Sale Agreement dated May 5, 1980, was signed by all parties. The agreement provided the purchase price of $50,000 was payable $12,500 down and the balance of $37,500 in 3 years in equal semiannual installments, plus 11 percent interest. Title of the seller was to be "free of encumbrances or defects except: Subdivision covenants and restrictions". Exhibit 2. Earnest money of $1,000 was paid and was to be applied to the down payment. The agreement also provided:

Seller shall furnish to purchaser a WLTA standard form policy of title insurance and as soon as practical prior to closing a preliminary commitment therefor issued by Island Title Insurance Company, and seller authorizes

broker or closing agent to apply as soon as practical for such title insurance. *The seller shall assume any cancellation fee for such commitment or policy.* The title policy to be issued shall contain no exceptions other than those provided in said standard form plus encumbrances or defects noted in Paragraph 1 above. If title is not so insurable as above provided and cannot be made so insurable by termination date set forth in Paragraph 11 hereof, earnest money shall be refunded and all rights of purchaser terminated; provided however, that purchaser may waive defects and elect to purchase. The broker shall not be responsible for delivery of title.

Exhibit 2. The agreement provided for closing as follows:

The sale shall be closed in the office of closing agent Schmidt & Linde, within 60 days after preliminary commitment for title insurance policy is delivered showing title insurable, as above provided, or after completion of financing, if financing is called for herein, whichever is later, but in any event not later than the 25th day of July, 1980 which shall be the termination date. The purchaser and seller shall deposit with closing agent all instruments, documents and monies necessary to complete the sale in accordance with this agreement.

Exhibit 2.

The agreement was delivered to Schmidt & Linde, the closing agent, sometime between June 10 and 15, 1980.

In an unchallenged finding of fact, the trial court found the parties "intended that title to the property be clear at the time of closing and execution of the real estate contract." Finding of fact 3, in part.

Delays occurred in closing the transaction. The closing agent prepared and mailed three different proposed real estate contracts to Langston. The first two proposed contracts, mailed on July 1 and July 7 or 8, did not accurately reflect the agreed upon payment schedule or the required status of the title. Mr. Abell of Bayshore notified Langston of the errors, told him not to sign the contracts but to return them, and that corrected contracts would be forwarded in due course. A correct real estate contract was mailed to Langston on or about September 23, 1980, and

was signed and returned by September 29, 1980.

Neither party had tendered performance on July 25, 1980, the scheduled closing date. At that time, the title records still indicated that Metropolitan Federal held a security interest in the property and did not reflect Huffacker as the legal owner of lot 7.

On July 31, 1980, Mr. Abell wrote to Dr. Burgess, explaining the delay in closing. The letter informed him that the transaction was not yet ready to close, but that Mr. Abell was continuing to "persevere," clearly implying that he expected the transaction to close. The letter stated, "Perseverance usually wins, and we shall persevere!" Exhibit 11. Mr. Abell received no reply to this letter from Dr. Burgess or from anyone on Huffacker's behalf.

Dr. Burgess allowed his part–time bookkeeper, Mrs. Keltto, and his son, Ernest Burgess, Jr., to act for him at times in connection with this transaction because he was traveling part of the time and was busy with his medical practice when in Seattle. After July 25, 1980, there were numerous contacts by Mrs. Keltto or Ernest, Jr., with Schmidt & Linde or Bayshore Realty, all regarding eventual closing of the sale.

Mrs. Keltto testified that she called Schmidt & Linde on June 16, July 8, July 28, August 7, and September 10, and on each call inquired as to the status of the transaction and was told, in essence, that they were "working on it." She did this so that she could report to Dr. Burgess. In an envelope mailed from Dr. Burgess' office, postmarked August 7, 1980, Schmidt & Linde received a copy of a deed verifying that Dr. Burgess had fulfilled the real estate contract with Roche Harbor. On or about August 12, Schmidt & Linde wrote to Metropolitan requesting documents necessary to clear the title of the deed of trust and those documents were received on or about August 20, 1980.

On October 6, Mrs. Keltto called Bayshore Realty inquiring about the status of the sale. She was never instructed by Dr. Burgess to notify anyone that the transaction was terminated. At no time prior to the afternoon of

October 9, 1980, did Bayshore, Langston, or Schmidt & Linde receive notification that Huffacker was going to rely on the July 25 termination date and would not proceed with the sale.

Langston was asked on October 9, 1980, for the first time, to deposit a check for closing, and on that same morning delivered a check for $11,864.08 to Mr. Abell, who immediately delivered the check and documents to the closing agent. Later, responding to a phone call, Mr. Abell was notified by Dr. Burgess that he would not close the transaction.

There was overwhelming evidence that Langston was ready, able, and willing to close the transaction on the closing date of July 25, 1980, and at all times thereafter. The trial court made a specific finding of fact to this effect, but denied specific performance on the theory that Huffacker had the right "to insist upon the timely performance of purchaser's obligation to close the real estate transaction on or before [J]uly 25, 1980."

The critical findings of fact by the trial court are findings 5, 6, 7 and 8, reading as follows:

V.

The real estate transaction did not close on or before July 25, 1980. The failure of the sale to close was the fault of the closing agent if there were fault and not the fault of either the purchasers or the seller. Said fault of the closing agent is not attributable to either purchasers or to seller.

VI.

Donna Burgess Huffacker did not do anything to relinquish voluntarily her right to insist on the timely performance by purchasers of their obligation to close the real estate transaction on or before July 25, 1980. Dr. Ernest Burgess, agent of seller, did nothing to relinquish voluntarily seller's right to insist upon the timely performance of purchaser obligation to close the real estate transaction on or before July 25, 1980.

VII.

Purchasers introduced no evidence showing any action taken by seller or her agent prior to the closing date to

mislead purchasers into a reasonable reliance upon seller's intent to waive the July 25, 1980 closing date or upon seller's intent to extend the closing date. There was no evidence that purchasers changed their position in reliance upon any action of seller or her agent. The only evidence introduced concerning seller's actions with respect to the real estate closing, other than the clarification of the name of the seller in early July, 1980, was evidence of the mailing of the warranty deed from the office of Dr. Ernest Burgess to the closing agent after the closing date.

VIII.

Purchasers did not deposit closing funds or an executed real estate contract with the closing agent on or before July 25, 1980. Nevertheless, purchasers were ready, willing, and able to purchase the real property up to the closing date set forth in the real estate purchase and sale agreement.

The court also found Huffacker's title could have been cleared by July 25, 1980, but was not cleared until the third week of August 1980.

The essence of Langston's argument is that he had no duty to perform until the title was clear and Huffacker was able to perform. Langston contends that because Huffacker was not in a position to perform on July 25, 1980, and Langston was at all times ready, able, and willing to perform, Huffacker could only put Langston in default by requesting performance within a reasonable time after Huffacker was able to perform. We agree.

Langston received instructions from Abell of Bayshore Realty not to sign proposed real estate contracts which were incorrect. Reasonably relying on those instructions, Langston simply waited until notified that the transaction was ready to close. Upon receiving that notification on October 7, Langston responded by promptly depositing all necessary funds and documents on October 9.

The contract signed by the parties contained dependent promises. Langston agreed to pay a certain price on certain terms and to close the transaction on a certain date providing title of the seller was free of encumbrances except subdivision covenants and restrictions. The parties intended

that at the time of closing the title was to be free of the deed of trust and seller's assignment of the Burgess contract held by Metropolitan. This made the unencumbered condition of seller's title a condition precedent to performance by Langston. The rule is stated in 6 S. Williston, *Contracts* § 832 (3d ed. 1962):

> Where a defendant's obligation is subject to a condition precedent of performance by the plaintiff, the latter must allege and prove that he:
> (1) performed the condition precedent, or
> (2) was excused from performance.
> This principle which is applicable to express conditions precedent has also been applied to dependent promises where no condition precedent is expressed, and this is natural since the theory of dependency has been developed under the guise of implied conditions. The implication was originally based on interpretation, but with the passage of time became so extensive that often the conditions implied were purely constructive. But whatever the nature of the condition precedent, the party whose performance is first in order of time must make the allegation and proof above stated.

(Footnotes omitted.)

In *Kolosoff v. Turri*, 27 Wn.2d 81, 176 P.2d 439 (1947), the court interpreted an earnest money agreement providing, in part:

> "*Owner shall furnish purchaser as soon as procurable and within 30 days* of date of acceptance of this offer, Puget Sound Title Company's policy of title insurance or its title report evidencing condition of title.
> . . .
> "The sale shall be closed in office of agent within 45 days after title insurance policy or title insurance company's report is furnished by owner. The purchaser and the seller will, on demand of either, deposit in escrow with the company furnishing the evidence of title all instruments and monies necessary to complete the purchase."

*Kolosoff v. Turri*, 25 Wn.2d 452, 453, 171 P.2d 234 (1946). The agreement was signed April 23, 1945. The title report was available but was not "furnished" to purchaser within the time requirements of the agreement. In holding that

the purchaser was entitled to return of his earnest money, the court said:

> In accord with the universal rule prevailing in this country, we hold that, in contracts such as we have before us in this case in which a seller agrees to *furnish* an abstract or policy of title insurance within a definite time, the seller must deliver the abstract or policy of title insurance to the buyer within the time stated in the contract. Further, that if the seller does not so deliver the abstract or policy, the buyer is at liberty to withdraw from the contract and may recover any amount theretofore paid.
>
> . . .
>
> Well–considered authorities everywhere agree that a contract may be so framed that the promises upon one side may be dependent upon the promises of the other. In such cases, the burden is upon the party who has made the dependent promise to comply with his part of the agreement. So it is in this case. Appellants received fifteen hundred dollars from respondent and then promised and agreed to furnish the policy of title insurance within thirty days. The burden of action was upon appellants. It was their duty to act. They knew that time was of the essence of the contract, and that they must perform within the time mentioned in the written agreement. Respondent was not, by the terms of the contract, obligated to perform any act until appellants had complied with the contract by furnishing the abstract. Respondent was entirely within his rights in awaiting the performance of a condition precedent by appellants, and to withdraw from the contract, and to recover the earnest money paid as soon as appellants defaulted.

27 Wn.2d at 89–90. *See also Dullanty v. Comstock Dev. Corp.,* 25 Wn. App. 168, 605 P.2d 802 (1980); *Partlow v. Mathews,* 43 Wn.2d 398, 406, 261 P.2d 394 (1953); Shattuck, *Contracts in Washington 1937–1957: Part III,* 34 Wash. L. Rev. 467 (1959).

Huffacker contends that July 25, 1980 was a termination date which had the effect of terminating the contract when it passed without either party tendering performance.

However, the trial court found that Huffacker's title *could* have been cleared by July 25, 1980, and substantial

evidence supports this finding. When Schmidt & Linde requested the documents needed to clear Huffacker's title, Metropolitan responded promptly. The trial judge concluded that although title could have been cleared, it was not cleared by July 25 through the fault of the closing agent. The trial court then erroneously concluded that this fault could not be attributed to either the seller or the purchaser. Both Huffacker's argument here and the trial court's conclusion below are incorrect because Huffacker had a legal duty to timely clear the title if it could be done by the exercise of reasonable diligence. *Kolosoff v. Turri*, 27 Wn.2d 81, 176 P.2d 439 (1947); *Hudesman v. Foley*, 4 Wn. App. 230, 480 P.2d 534 (1971).

In *Egbert v. Way*, 15 Wn. App. 76, 546 P.2d 1246 (1976), the seller, Mrs. Way, had 1 year in which to clear title. She allowed the 1 year to pass and then attempted to defend a suit for specific performance on the ground that time for performance had expired under the terms of the contract. The court disposed of her contention as follows:

> Though the time for performance has expired under the offer to purchase, Mrs. Way should not be excused from further performance when she failed to exercise good faith in performance of the condition precedent. The Egberts as the injured parties could have rescinded the contract after Mrs. Way's failure to perform within the time limits of the contract. However, the time limits in the contract, even though made of the essence, do not operate to excuse Mrs. Way from specific performance when the breach is the result of her own bad faith and lack of diligence in clearing the title.

(Footnotes omitted.) 15 Wn. App. at 81–82. *See also Paullus v. Fowler*, 59 Wn.2d 204, 214, 367 P.2d 130 (1961) and *Weaver v. Fairbanks*, 10 Wn. App. 688, 691, 519 P.2d 1403 (1974). Likewise,

> In *Nadeau v. Beers*, 73 Wn.2d 608, 610, 440 P.2d 164 (1968), the court held when an agreement makes time of the essence, fixes a termination date, and there is no conduct giving rise to estoppel or waiver, the agreement becomes legally defunct upon the stated termination date if performance is not tendered. *See also Pavey v. Collins*,

31 Wn.2d 864, 199 P.2d 571 (1948); *Thayer v. Damiano,* 9 Wn. App. 207, 511 P.2d 84 (1973); 91 C.J.S. *Vendor and Purchaser* § 99 (1955). The only exception we find to this rule is when the failure to meet the time limit is the result of one of the parties' bad faith or lack of due diligence. *Egbert v. Way,* 15 Wn. App. 76, 81–82, 546 P.2d 1246 (1976); *Hudesman v. Foley,* 4 Wn. App. 230, 232–33, 480 P.2d 534 (1971).

*Local 112, I.B.E.W. Building Ass'n v. Tomlinson Dari–Mart, Inc.,* 30 Wn. App. 139, 142–43, 632 P.2d 911 (1981).

The facts establish that diligent attention by Huffacker to her duty to clear her title to the required condition would have made it possible to close the transaction on July 25, 1980. The failure to meet the time limit was the result of her lack of diligence. The purchasers are entitled to specific performance.

Huffacker has cross–appealed, contending the trial judge erred in awarding Bayshore its 10 percent real estate commission, plus attorney's fees and costs.

■ The exclusive listing agreement provided that Huffacker was to pay Bayshore 10 percent of the selling price if Bayshore procured an offer to purchase on terms acceptable to Huffacker. Under the general rule, when a seller accepts a purchaser's offer and enters into a binding and enforceable contract for the sale of property, the seller owes a commission to the real estate broker. *White & Bollard, Inc. v. Goodenow,* 58 Wn.2d 180, 187, 361 P.2d 571 (1961). Huffacker contends the general rule does not apply because Bayshore was representing the interests of the purchasers, who were making a belated effort to close. He supports his contention by reference to evidence that Mr. Abell asked the closing agent to "interest [him]self" in the closing. Huffacker contends this was a violation of Bayshore's duty of loyalty and establishes that Bayshore is not entitled to a commission, citing *Mele v. Cerenzie,* 40 Wn.2d 123, 241 P.2d 669 (1952) and *Mersky v. Multiple Listing Bur., Inc.,* 73 Wn.2d 225, 437 P.2d 897 (1968). We do not agree.

Bayshore fulfilled its contractual obligation to Huffacker upon execution of the earnest money agreement by both

Huffacker and Langston on May 27, 1980. Payment of the commission was not conditioned upon future services by the broker or future consummation of the sale. *Richey v. Bolton,* 18 Wn.2d 522, 140 P.2d 253 (1943). When the agreement was executed, Bayshore was entitled to $5,000.

The listing agreement provided:

VII. ATTORNEYS FEES.

In the event that the agent shall employ an attorney to enforce the foregoing, or any other terms of this agreement, and shall be successful in enforcing the same, seller agrees to pay a reasonable attorneys fee and any court costs incurred in connection therewith.

Under the clear and unambiguous terms of the agreements, Bayshore is also entitled to reasonable attorney's fees for collecting the commission. *Bonanza Real Estate, Inc. v. Crouch,* 10 Wn. App. 380, 517 P.2d 1371 (1974); *McKoin v. Kunes,* 5 Wn. App. 731, 490 P.2d 735 (1971).

Bayshore contends the judge erred in refusing its request for prejudgment interest, claiming the commission was a liquidated claim. We agree.

The rule in Washington is that:

[I]nterest prior to judgment is allowable (1) when an amount claimed is "liquidated" or (2) when the amount of an "unliquidated" claim is for an amount due upon a specific contract for the payment of money and the amount due is determinable by computation with reference to a fixed standard contained in the contract, without reliance on opinion or discretion.

*Prier v. Refrigeration Eng'g Co.,* 74 Wn.2d 25, 32, 442 P.2d 621 (1968). Bayshore was entitled to prejudgment interest on its commission from the date the real estate purchase and sale agreement was executed. *Quadrant Corp. v. Spake,* 8 Wn. App. 162, 504 P.2d 1162 (1973).

Bayshore also contends Huffacker's appeal on the issue of Bayshore's entitlement to a commission is frivolous and brought for the purposes of delay, justifying imposition of terms and sanctions pursuant to *Streater v. White,* 26 Wn. App. 430, 613 P.2d 187 (1980). We do not agree.

Huffacker, as respondent, had the right to cross-

appeal under RAP 2.2. All doubts as to whether the appeal is frivolous are resolved in favor of Huffacker. The record is considered as a whole, and appellate arguments which are rejected are not necessarily frivolous. The appeal is frivolous if there are no debatable issues upon which reasonable minds might differ and the appeal is so totally devoid of merit that there is no reasonable possibility of reversal. *Streater v. White, supra* at 434–35.

There is a reasonable, if erroneous, basis for Huffacker's challenge to the trial court's award of the commission. Huffacker prevailed at trial. It appeared illogical to order Huffacker, as a seller not in breach of the earnest money agreement, to pay a real estate commission and attorney's fees on an unconsummated sale. *Streater* is distinguishable because the appellants in that case did not prevail at trial, and the issue was therefore not logically debatable. Huffacker's cross appeal was not frivolous.

We affirm the portions of the judgment awarding the 10 percent real estate commission to Bayshore, awarding attorney's fees at trial, and we award attorney's fees to Bayshore on appeal in the amount of $2,000. We reverse and remand the remainder of the judgment for entry of an order requiring specific performance of the real estate purchase and sale agreement and awarding prejudgment interest to Bayshore in accordance with this opinion.

CORBETT, A.C.J., and ANDERSEN, J., concur.