# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| SERGEY SAVCHUK, a married man, | ) | No. 68608-9-I |
| Appellant, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| STEVEN G. JERDE and DARLYCE J. JERDE, husband and wife and the marital community comprised thereof, | ) | |
| Defendants, | ) | |
| CHRISTINE SAMS and METRO REALTY, INC., | ) | |
| Respondents. | ) | FILED: September 3, 2013 |

APPELWICK, J. — Savchuck appeals the summary judgment order dismissing his tort claims against a real estate agent who assisted him in the purchase of real property. We affirm.

## FACTS

Sergey Savchuk emigrated from Kazakhstan in 1989. English is not his first language. Although he has learned conversational English, he does not always understand complicated or technical conversations and claims that his written understanding is worse than his oral understanding.

Savchuk regularly purchases and develops real property in the United States. Because of his language limitations, he relies on professionals for some matters in the course of business. For instance, he relies on engineers and architects when obtaining building permits and on real estate agents when conducting real estate transactions.

From 2003 through 2006, Christine Sams of Metro Realty was one of those trusted real estate agents.

In August 2006, Sams encouraged Savchuk to purchase a property in Ferndale owned by Steven and Darlyce Jerde. Savchuk was hesitant, because he did not think he could get bank financing and had never worked on a deal requiring development of raw land through seller financing. Savchuk eventually decided to make an offer. The Jerdes accepted Savchuk's offer to purchase the property for $910,000 and signed a real estate purchase and sale agreement (REPSA). That agreement provided for closing on December 18, 2006, a promissory note and deed of trust, and full payment of the purchase price by August 31, 2007. But, after the investigation period, Savchuk elected not to go forward with the deal.

In January 2007, Savchuk executed a new REPSA, agreeing to pay $725,000 for the property. The REPSA provided for title at closing which was to occur on August 31, 2007 or sooner as mutually agreed. It provided for a $20,000 earnest money payment, and stated that forfeiture of earnest money was the Jerdes' sole and exclusive remedy in the event that Savchuk failed to complete the purchase. The REPSA included two addenda concerning payment terms.

The form 22C payment terms addendum that was <u>executed in October 2006</u>, pursuant to the parties' first REPSA, was attached <u>unamended</u>. It provided:

> **NOTE AND DEED OF TRUST.** Buyer agrees to pay $525,000.00 down, including Earnest Money, at Closing and the balance of the Purchase Price to Seller in monthly installments of interest only on principal balance or more at Buyer's option, including interest from the date of Closing at the rate of 7% per annum on the unpaid principal, on or before the 15th day of each month, commencing . . . 30 days following the closing . . . . This

indebtedness shall be evidenced by a Promissory Note and a . . . first position . . . Deed of Trust, as set forth below.

**Due Date**. The entire balance of principal and interest shall be due and payable . . . on 08/31/2007.

. . . .

**Promissory Note**. Buyer agrees to sign at Closing the NWMLS [(Northwest Multiple Listing Service)] Form 22M Promissory Note . . . and LPB Form 22 Deed of Trust securing the Property, or an equivalent form, which must be attached to this Agreement.

Second, a form 34 addendum/amendment executed contemporaneously with the January 2007 REPSA was attached. The form 34 expressly waives the contingency feasibility, the only contingency in the REPSA, and provides explicit payment terms:

1. The feasibility contingency is removed.

2. $20,000 earnest money becomes a non-refundable deposit, to be disbursed to Sellers immediately.

3. Purchase price: $725,000

4. Payment Terms: Note & Deed of Trust. Interest pmts to be paid monthly on unpaid balance, 7% interest. Contract administration by Trust Accounting Ctr, Anacortes, WA, all costs associated paid by Buyer. Payments disbursed by Trust Accounting Ctr to Seller.

5. Principal payments as follows:

   $30,000 due 1/15/07
   $50,000 due 2/1/07
   $50,000 due 4/1/07
   $50,000 due 6/1/07
   $50,000 due 8/1/07
   Due in full 8/31/07

6. Closing date shall be on or before August 31, 2007.

. . . .

ALL OTHER TERMS AND CONDITIONS of said Agreement remain unchanged.

3

All that Savchuk had to do to close the transaction was make his payments.

The REPSA attachments did not include a completed promissory note or deed of trust. Savchuk claims that he understood that the REPSA was supposed to close upon the tender of a note and deed of trust, while Sams claims there was never any intent to finance the sale with a note and deed of trust. She asserts payment was supposed to be completed entirely by installment payments.

By August 2007, the scheduled month of his final installment payment, Savchuk had paid $200,000. He was unable to come up with the rest of the money, and either he or the Jerdes proposed an extension of the closing date.

According to Savchuk, Sams was out of the country at the time and could not take part in negotiations. He claims that Sams instead advised him that the Jerdes' agent, Anne Inman, would treat him fairly. Savchuk negotiated with Inman to extend the closing date an additional nine months to May 30, 2008, and Inman drafted the extension agreement. Savchuk paid $10,000 to extend the closing date and ultimately signed a one page document that changed many terms from the REPSA. It extended the closing date nine months:

> Extension of closing date: The parties hereby agree to extend the closing date set forth in the agreement until: May 30, 2008.

It increased the interest rate:

> Beginning 9/1/2007, interest shall accrue on unpaid balance at a rate of 7.5%.

It permitted the Jerdes to retain the property for 30 days after closing:

> Seller retains possession up to 30 days after closing at no cost.

4

It provided a new payment schedule, and imposed an additional penalty on late payments:

> Buyer will pay $250,000 on 8/31/07 and $25,000 on 9/7/07
>
> . . . .
>
> Payments of $25,000 every other month, due the 1st of every month
> $25,000 due 10/10 [sic] /07, 12/1/07, 2/1/08, 4/1/08 and balance 5/30/08.
>
> Payments not made within 3 business days of the due date shall accrue a late penalty of 5% of the payment amount.
> This shall apply for both principal and interest payments due.

Most significantly, it made all payments non-refundable:

> All payments are non-refundable in the event of failure to close.

Savchuk made his last payment in December 2007, and did not close on May 30, 2008. Savchuk v. Jerde, noted at 158 Wn. App. 1022, 2010 WL 4277872, at *2. In February 2009, he sued the Jerdes, seeking to recover his payments. Id. He alleged breach of contract and that the nonrefundable payment provision in the extension agreement was void as an unenforceable remedy. Id. The trial court granted the Jerdes' motion for summary judgment on the grounds that the nonrefundable payment provision was unambiguous and enforceable. Id.

On appeal, we concluded that Savchuk clearly breached the extension agreement by failing to make scheduled payments, but noted that the trial court did not address whether the nonrefundable payment provision was an unenforceable remedy. Id. at *3, 6. Specifically, we explained that such a provision could constitute a valid liquidated damages provision. Id. at *3-5. We remanded for the trial court to resolve issues of fact concerning whether the parties intended for the provision to be an

5

estimate of damages in the event of default and, if so, whether the estimate of damages was reasonable. Id. at *6.

On remand, Savchuk filed an amended complaint adding Sams and Metro Realty as defendants (together, "Sams"). He alleged that Sams was negligent, breached her duties as a real estate agent, and violated the Consumer Protection Act (CPA), chapter 19.86 RCW. Savchuk and the Jerdes ultimately settled.

After Sams filed a motion for summary judgment, Savchuk submitted his own declarations, and declarations by expert witnesses outlining the applicable standard of care for attorneys and real estate agents. The trial court granted Sams's motion for summary judgment and dismissed all of Savchuk's claims.

## DISCUSSION

We review summary judgment orders de novo. Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 501, 115 P.3d 262 (2005). Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Id. The facts and all reasonable inferences are considered in the light most favorable to the nonmoving party. Id. But, the nonmoving party cannot rely solely on the allegations in pleadings, on speculation, or on argumentative assertions that unresolved factual issues remain. White v. State, 131 Wn.2d 1, 9, 929 P.2d 396 (1997). We can affirm an order granting summary judgment on any basis supported by the record. LaMon v. Butler, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989).

Savchuk claims he has identified numerous issues that preclude summary judgment.[1] For instance, he argues that several claims arise from the REPSA itself:

> [Sams still breached her] duties to Savchuk with respect to several of Savchuk's claims that arise out of the terms of the PSA itself[.] These include claims for: 1) negligence; 2) breach of the duty to exercise reasonable skill and care under RCW 18.86.030(1)(a); 3) breach of a duty to deal honestly and in good faith under RCW 18.86.030(1)(b); 4) breach of the duty to disclose material facts under RCW 18.86.030(1)(d); 5) breach of a duty to advise the buyer to seek expert advice on matters relating to the transaction that are beyond the agent's expertise under RCW 18.86.050(1)(c); 6) breach of fiduciary duty; and 7) violation of the Consumer Protection [Act] in the drafting of the [RE]PSA and arising out of terms of the [RE]PSA.
>
> . . . .
>
> Thus, [Sams] clearly owed Savchuk a duty with respect to most, if not all, [of] his claims asserted in this matter.

He similarly provides an extensive lists of alleged breaches of the duty to exercise reasonable skill and care:

> Specifically, Mr. Bjerke's Declaration opined that Sams breached her duty to Savchuk by: 1) failing to clarify the conflict between the Safe Harbor provision, limiting Savchuk's liability to his $20,000 earnest money deposit, and other provisions of the [RE]PSA, including Forms 22C and 34, setting forth conflicting schedules of installment payments that might be viewed as nonrefundable; 2) failing to advise Savchuk that his liability would be limited to the $20,000 earnest money in the [RE]PSA, under the Safe Harbor provision in the [RE]PSA, even though Sams understood that

---

[1] We note that he intermittently refers to these issues as legal and factual matters. He refers to claims that he alleges survive summary judgment, without explaining what facts support the claims. He likewise provides lists of issues identified by his experts, but does not provide any analysis of how the expert's statements support his claims. These lists are not merely an outline of his arguments; in many instances they represent the meat of his argument. Further, he frequently fails to provide any support for the legal and factual assumptions underlying the expert's opinions. The lists are often followed by block citations to as much as 50 pages of the record. That format fails to provide a specific reference to the record for each factual statement as required by RAP 10.3. Many of those legal assumptions are incorrect and the factual assertions are not supported by the record.

Safe Harbor provisions generally limit a seller's remedy to the earnest money deposits; 3) including language in the [RE]PSA under which a portion of the purchase price would be paid under a note and deed of trust, without attaching any form note and deed of trust, and leaving the provisions regarding the payment of the purchase price ambiguous; 4) failing to include terms in the [RE]PSA requiring the transfer of title to Savchuk in exchange for a deed of trust, mortgage or real estate contract, or to advise Savchuk that the commonly accepted means by which a buyer purchases property on an installment basis is such a security instrument; 5) failing to advise Savchuk that the sellers' retention of $575,000 on a $750,000 purchase is inappropriate and probably unenforceable; 6) including provisions in the [RE]PSA permitting sellers' inappropriately to collect interest payments, even though the sellers' had not loaned Savchuk any money; 7) entering into an arrangement under which Sams received nonrefundable installment commission payments prior to closing and despite the fact that the transaction never closed, without disclosing this arrangement to Savchuk; and 8) abandoning Savchuk and advising him to rely upon the adversary's agent's advice and counsel, rather than providing necessary input and advice with respect to the August Extension.

Savchuk also argues that, at a minimum, reversal in part is warranted because Sams did not specifically address each of Savchuk's claims in her motion for summary judgment and the trial court did not have authority to dismiss claims not addressed. But, Sams sought "summary judgment dismissing the Second Amended Complaint" in its entirety. The motion touched on issues that supported dismissal of all claims. Moreover, his argument highlights the inherent confusion in his enumerated claims. He asserts that Sams only addressed six claims in her motion for summary judgment, and failed to address three claims. That suggests he made nine claims in his complaint. But, his complaint contains only three counts against Sams, and those three counts are comprised of twenty six separate points. He has not explained how he now arrives at the conclusions that Sams had to address nine separate claims. He also argues that the motion for summary judgment did not address whether Sams violated her fiduciary duties, or her duties of reasonable skill and care, of loyalty, and to avoid conflicts of

8

interest. His complaint, in contrast, does not contain the phrases "fiduciary duties," "reasonable skill and care," "loyalty," or "conflicts of interest." He instead made general reference to negligence and enumerated duties under RCW 18.86.030, RCW 18.86.050, and chapter 18.86 RCW.

We address Savchuk's claims in the context of duties allegedly violated prior to the execution of the January 2007 REPSA, and those that allegedly occurred after its execution. Summary judgment on all claims was appropriate.

## I. Duties prior to the execution of the REPSA

Savchuk contends that the REPSA is "a crazy quilt of ambiguities and contradictions" and that numerous breaches of duty flow from that ambiguity. The agreement is not as hopelessly ambiguous as he suggests. The claims for breach of duty prior to the execution of the REPSA fail as a matter of law.

### A. Note and Deed of Trust

Savchuk argues that the REPSA created ambiguity concerning whether the deal was supposed to close pursuant to a promissory note and deed of trust. He claims Sams violated her duties by failing to attach a promissory note and deed of trust, and failing to include terms in the REPSA requiring the transfer of title in exchange for a deed of trust, mortgage contract, or real estate contract.[2] He claims that, but for her breaches in structuring the deal, he would have been in a better position and could have made productive use of the property by renting or selling it.

---

[2] Although Savchuk mentions a mortgage contract and real estate contract, he only offers argument concerning a note and deed of trust.

The REPSA executed in October 2006 contemplated a purchase price of $910,000, with closing on December 18, 2006. The attached form 22C payment terms addendum has several options for payment method. The parties checked the box for "Note and Deed of Trust." It states that Savchuk will make a $525,000 down payment at closing and with the entire balance of principle and interest payable in full on August 31, 2007. By contrast the January 2007 REPSA "specific terms" form states that the purchase price is $725,000. It then lists attached addenda, which include form 34 and "promissory note." The form 22C from the October 2006 deal, attached without modification, requires payment in full by August 31, 2007. Form 34, executed in January 2007, explicitly describes the interest rate and payment schedule and changes the closing date to "August 31, 2007 or sooner as mutually agreed."

Any apparent ambiguity created by reference to a note and deed of trust which were not attached is clarified by the actual terms of the agreement. Unless the parties agreed to close earlier than August 31, 2007, there was no need for or value to a promissory note and deed of trust. This is because under form 34 the debt was set to be paid in full at closing, on August 31, 2007. However, had Savchuk sought and obtained agreement to an earlier closing date, he was entitled to the statutory warranty deed, the Jerdes were entitled to a promissory note for the outstanding balance, and undoubtedly the Jerdes would have insisted on a deed of trust to protect themselves. The protection via deed of trust that Savchuk complains is missing was available, but only if the parties agreed to an earlier closing date. And, although Savchuk asserts that he thought the deal would close pursuant to a note and deed of trust, he does not claim that he directed Sams to draft an offer that exclusively required a note and deed of trust.

He does not allege that the ambiguity makes the contract unenforceable. Since he did not opt to close earlier than August 31, neither the note or deed of trust were necessary to the transaction. Any harm he alleges flows from his failure to request the earlier closing date, not reference to unattached documents.

B. Failure to Advise

Savchuk makes a variety of claims that rely on Sams's alleged failure to advise him of the contents of the REPSA. In particular, he claims that Sams failed to advise him that the deal could only close pursuant to a note and deed of trust. But, the deal did not have to close pursuant to a note and deed of trust. Savchuk does not establish that Sams had a duty to advise him how to perform the agreement after he executed it, including whether to seek an earlier closing date. Savchuk also argues that Sams failed to inform him that his liability was limited to forfeiture of his $20,000 earnest money deposit, and failed to advise him that the REPSA did not include a completed note or deed of trust. The failure to advise him of the contents of the REPSA arguments are apparently based on the premise that he does not understand English very well and relied on Sams. But, he is merely alleging that Sams failed to inform him of what was in the contract, not that Sams made any affirmative statements that could support a theory of fraud or coercion. He is not seeking to invalidate the contract. He has not cited any authority that would allow us to disregard the content of the written agreement in favor of what he alleges Sams failed to tell him. "'The whole panoply of contract law rests on the principle that one is bound by the contract which he voluntarily and knowingly signs.'" Skagit State Bank v. Rasmussen, 109 Wn.2d 377, 381, 745 P.2d 37 (1987) (quoting Nat'l Bank v. Equity Investors, 81 Wn.2d 886, 912-13, 506 P.22d 20 (1973)).

11

Where a party has ample opportunity to examine a contract in as great a detail as he cares, "he cannot be heard to deny that he executed the contract, and he is bound by it." Lake Air, Inc. v. Duffy, 42 Wn.2d 478, 480, 256 P.2d 301 (1953). The REPSA clearly limited Savchuk's exposure to the $20,000 earnest money deposit, clearly contemplated installment payments with the balance due in full by closing, and clearly permitted closing without a note and deed of trust. Savchuk cannot succeed by asserting that Sams did not orally relay each provision in the contract.

C. Refundability

Savchuk argues that Sams violated her duties because the REPSA does not clarify the difference between the earnest money deposit and the scheduled payments. He claims that the Jerdes' remedies were limited to Savchuk's earnest money deposit, but that the agreement makes it ambiguous whether Savchuk's subsequent payments were refundable. He fails to explain what in the agreement makes it ambiguous. The January 2, 2007 REPSA clearly states, in multiple places, that the earnest money deposit is nonrefundable. It further provides that forfeiture of earnest money is the "sole and exclusive" remedy in the event of default. Thus, keeping the installment payments was not an available remedy. Savchuk even asserts that, "[a]mple evidence supported the conclusion that Savchuk neither knew nor understood that these additional deposits would be nonrefundable." Savchuk had it right. The payments were refundable and there is nothing in the REPSA that suggests otherwise.

D. Expert Advice

Savchuk argues that Sams had a duty to advise Savchuk to seek expert advice from an attorney, because an attorney would have advised Savchuk to make the

12

installment payments refundable and because risks of the deal's structure were beyond Sams's expertise. But, we disagree with Savchuk's legal conclusion that the payments could be viewed as nonrefundable. And, despite Savchuk's protestations that the REPSA presented unusual risks, the risks were known. The October 2006 REPSA contained a feasibility contingency, which entitled Savchuk to break the contract without losing anything. After he waived the feasibility contingency in January 2007, his exposure for breaking the contract remained limited to forfeiture of his $20,000 earnest money deposit.

E. Commissions

Savchuk argues that Sams breached her duties by accepting commission payments as Savchuk made his installment payments, instead of as a bulk sum at closing. He claims that if he had known that Sams was set to receive commission payments as he made payments, he would have become suspicious and would not have signed the REPSA without obtaining further advice. He relies on an expert witness's opinion that the arrangement was improper because it improperly incentivized Sams to push for closing irrespective of Savchuk's best interests. But, both Savchuk's and his expert's statements are based on the unsupported assertion that Sams was receiving nonrefundable commissions, was set to receive them prior to execution of the REPSA, and knew that fact. There are only two documents in the record that address commission payments. An "optional clauses" addendum executed in October 2006 states that the listing office will receive a 4 percent commission and the selling office, Sams, would receive a 2.5 percent commission. The commission would be paid by the Jerdes. Another document, form 90 notice, signed in December 2006, states that the

commissions "shall be disbursed from escrow (prior to closing) per payment schedule." Neither reference states that the commission payments are nonrefundable. Savchuk's legal assertion that the payments were nonrefundable is not supported by the record. Further, Savchuk's expert based his opinion on his statement that Sams "contracted for, and received" nonrefundable payments. Even assuming that the commission payments were nonrefundable, the December 2006 commissions agreement is signed by the Jerdes and their agent. Sams is not a party to that contract and obtained rights to a commission only by procuring a buyer.[3] Savchuk has not cited any evidence that could support his theory.

### F. Interest Payments

Savchuk argues that Sams breached her duties by permitting the Jerdes to charge interest on funds that had not been loaned. He does not cite any case or statute establishing that a buyer cannot agree to pay interest on installment payments. Indeed, the usury provision in RCW 19.52.010 contemplates that interest can be charged for any "loan or forbearance."

### II. Duties after execution of the REPSA

Savchuk likewise cannot establish that Sams breached any duties after the execution of the REPSA, because she did not owe him any duties at that time. And, even if she did, neither her actions before or after the REPSA was executed caused Savchuk's harm. His claims fail as a matter of law.

---

[3] Further, as discussed below, commissions are generally earned when an enforceable REPSA is signed and all contingencies are waived or satisfied. Savchuk knew that Sams would receive a commission. When Sams actually received her payments is an issue of timing, not entitlement. Her incentive to pursue closing existed regardless of when payments were received.

14

Under RCW 18.86.070, the agency relationship between a broker and a principal continues until the earliest of completion of performance by the broker, expiration of the term agreed to by the parties, termination of the relationship by mutual agreement, or termination of the relationship by notice from either party to the other. This statutory provision makes no distinction between the broker representing the buyer or the seller.

The relevant inquiry in this case is when there was "completion of performance." Completion of performance occurs when the broker has earned his or her commission. Pilling v. E. & Pac. Enters. Trust, 41 Wn. App. 158, 165, 702 P.2d 1232 (1985). Commission is generally earned when a seller accepts a purchaser's offer and enters into a binding and enforceable contract. Langston v. Huffacker, 36 Wn. App. 779, 789, 678 P.2d 1265 (1984). That is not to say an agent and his principal cannot make an agreement further limiting the right to a commission. For instance, in Cogan v. Kidder, Mathews & Segner, Inc., the agency relationship did not terminate when a binding and enforceable contract was entered, because the agent continued to work toward closing and the earnest money agreement expressly provided that the commission would be earned "'if and when the sale closes.'" 97 Wn.2d 658, 663-64, 648 P.2d 875 (1982). Likewise, in Ward v. Coldwell Bank/San Juan Props., Inc., a sale was contingent upon the buyer obtaining financing. 74 Wn. App. 157, 162, 164, 872 P.2d 69 (1994). The court concluded that, "[t]o the extent [the agent] was acting to close the sale, it owed an ongoing duty to the [principal] until the sale closed." Id. at 164. The clear rule emanating from these cases is that a commission is earned when an agreement is entered, all contingencies are waived or satisfied, and the commission itself is not

15

further limited by agreement. No written agreement existed between Sams and Savchuk which created, extended, or limited duties.

Savchuk argues that those cases concerned sellers and that there is no such rule for buyer's agents. But, he does not cite any authority suggesting that a different rule applies for buyer's agents, and the governing statutes do not make any distinction between buyer's and seller's agents. He also argues that when the commission is earned is an issue determined by contract, usually in the listing agreement, and that the listing agreement is not in the record. That, however, supports the conclusion that the general rule applies here. If he wants to argue that the listing agreement extended Sams's duties, he needs to produce some evidence of its contents. Savchuk cannot establish a genuine issue of material fact by hypothesizing about what items outside the record might say.

Sams represented Savchuk during negotiations, through the time he signed the REPSA in January 2007. The original agreement signed in October 2006 contained only a feasibility contingency. That contingency was expressly waived in January 2007. No further contingencies remained, and all Savchuk had to do was make his scheduled payments. There was nothing left for Sams to do and she did not owe Savchuk further duties.

At some point in 2007, Savchuk breached the contract and he was unable to close in August 2007 as contemplated by the REPSA. Although he asserts that Sams provided deficient performance, his liability at that time was limited to forfeiture of his $20,000 earnest money deposit.

16

He claims that he contacted Sams concerning the extension, and Sams "urged me to agree to the extension and told me that I could rely on the Jerdes' agent, Anne Inman, to treat me fairly." "As a consequence, I did rely on Anne Inman." Those alleged statements are insufficient to revive Sams's duties. It is undisputed that she did not review the agreement. In fact, it is undisputed that she did not even know the terms of the extension, let alone advise Savchuk concerning those terms. She did not improperly abdicate her duties by failing to do so, because she had no duties to Savchuk at the time. Further, her statement that Inman would treat Savchuk "fairly" suggests only that Inman would treat him fairly in negotiations. That does not imply that she recommended Savchuk treat Inman as his agent. Although Savchuk claims he relied on Inman, he does not claim that he expected Inman to act in his best interests. Nor should he have, regardless of whether Inman was a fair negotiator, he still knew she was the Jerdes' agent.[4]

Although Sams could have represented Savchuk in the August 2007 negotiations, she did not do so and she had no obligation to do so. She had fulfilled her duties. Without her participation, and without seeking assistance from another agent or an attorney, he negotiated with Inman and added an addendum to the REPSA that contained significantly worse terms. In addition to raising the interest rate and paying an extension fee, the agreement expressly stated that all payments were non-

---

[4] A broker who performs real estate brokerage services for a buyer is a buyer's agent unless the broker has entered into a written agency agreement with the seller, in which case the broker is a seller's agent. RCW 18.86.020(1)(a). Inman negotiated with Savchuk. She did not provide him brokerage services. And, Savchuk did not enter an agreement with Inman making her a dual agent as contemplated by RCW 18.86.060.

17

refundable in the event of failure to close. His renegotiation and subsequent breach of the extension agreement ultimately led to his damages.[5]

III.  Conclusion

Sams's duties were terminated upon the execution of a valid and enforceable agreement with no remaining contingencies. Savchuk has not established that there are genuine issues of material fact concerning breaches that allegedly occurred before the execution of the REPSA that preclude summary judgment. Further, Savchuk's damages were caused by his indisputable breach of the contract, renegotiation of the agreement in August 2007, and breach of that extension, none of which Sams participated in. No breach of duty or negligent conduct claims remain, upon which the CPA claim could have been predicated. Sams is entitled to summary judgment as a matter of law. The superior court did not err.

We affirm.

_Appelwick, J._

WE CONCUR:

_____          _____

_____

[5] Sams makes a cursory argument that, even if she breached her duties concerning the January 2007 REPSA, her breach did not proximately cause Savchuk's harm, because he renegotiated without her participation. We conclude that Sams did not breach her duties prior to the execution of the January 2007 REPSA, and had no duties after the agreement was executed. We need not reach her causation argument.

18