**Charles J. GARBE, Ralph Holloway, Appellants (Plaintiffs Below),**

v.

**EXCEL MOLD, INC., Moldcraft Tools, Inc., and Harold B. Bruhn, Appellees (Defendants Below).**

No. 1–878–A–221.

Court of Appeals of Indiana, First District.

Dec. 5, 1979.

---

Clifford G. Antcliff, Antcliff & Brown, Greenwood, for appellants.

Mark A. Pope, Ben J. Weaver, Johnson & Weaver, Indianapolis, for appellees.

ROBERTSON, Judge.

This action is a suit by two minority shareholders, Charles J. Garbe (Garbe) and Ralph Holloway (Holloway) against the promoter and majority shareholder of the Excel Mold, Inc. (Excel) corporation, Harold B. Bruhn (Bruhn), and against the corporation itself to set aside a stock transfer between Bruhn and Excel. The trial court, without the intervention of a jury, ruled in favor of the defendants. We affirm.

The factual background to this case is that a previous corporation with the same name as the one involved in this suit was owned by N. L. Industries. "Old" Excel Mold, Inc. was a mold and diemaking business in Indianapolis. In the early part of 1974, Bruhn, who at the time was vice-president and general manager of the concern, was informed that N. L. Industries intended to dispose of the business. Bruhn was asked if he was interested in purchasing it. After consulting an accountant and an attorney on August 16, 1974, Bruhn and N. L. Industries entered into a purchase agreement whereby Bruhn was to purchase the assets of old Excel Mold, Inc. These assets included the land, building, equipment, goodwill, accounts receivable, prepaid expenses and inventory. In short, Bruhn agreed to buy the whole business as a going concern. In exchange for these assets, Bruhn was to pay $300,000 in cash from funds generated by a Small Business Administration loan administered by a bank, sign an approximately $60,000 note, sign an $80,000 mortgage and note on the land and building, and assume various liabilities of old Excel Mold, Inc. The purchase agreement provided for last minute adjustments of the accounts receivable and payable and the inventory on hand.

In order to get the $300,000 loan, Bruhn became personally liable, obtained second mortgages on his personal residence and the business, had an Article 9 lien placed on the equipment, pledged his stock as collateral, and insured his life and assigned the policy to the bank. It would not be an exaggeration to state that Bruhn bought the assets totally with borrowed sums.

A requirement for obtaining the loan was to appraise the machinery equipment of the business, which was its major asset. The equipment was allocated in the purchase agreement at a value of $244,200 but was appraised by a third party expert at $395,800. In other words, the appraisal suggested that Bruhn had struck a favorable bargain, other assets aside, a bargain of $151,600.

It was at this stage that the plaintiffs Garbe and Holloway entered the transaction. They were employees of old Excel Mold, Inc. and during the summer or fall of 1974 were questioned by Bruhn as to whether they wished to invest in the business. The two met with Bruhn and his accountant on August 6, 1974. The accountant then outlined to Garbe and Holloway the following plan. Garbe was to invest $15,000 and Holloway $10,000 in the form of $100 shares in a new corporation, Moldcraft Tool, Inc. to be set up by Bruhn.[1] Bruhn would assign all his interest in the purchase agreement to Moldcraft, except the land and building which he would retain individually. Most liabilities, including the $300,000 loan, would be assumed by the new corporation except the liabilities relating to the land and building.

The accountant proposed that Bruhn would invest only $5,000 but would receive slightly over 80% of the outstanding stock. The reason for this large share was because Bruhn would receive stock for the amount of the benefit of his bargain, that is: the difference between the fair market or appraisal value of the equipment ($395,800) and the allocated purchase agreement value ($244,200), a difference of $151,600. In other words, exclusively for purposes of valuing Bruhn's contribution of property to the corporation, the transaction would be treated as if Bruhn had "sold" the equipment to the new corporation at fair market value, remembering, of course, that the equipment was essentially encumbered at an allocated amount of $244,200.[2] Garbe and Holloway were fully informed of this plan before they invested, albeit the information was complex.

The complaint filed against Bruhn and the corporation alleged that there was no

consideration for the stock that Bruhn received and prayed that Bruhn retain only that stock for which he paid cash.

After a bench trial, the court made findings of fact and conclusions of law and concluded that the above transaction was fully disclosed to Garbe and Holloway and that the transaction was not fraudulent or unfair.

We first note that Garbe and Holloway are appealing a negative judgment. Their claims of insufficient evidence present no issue for review. *Graves v. City of Muncie* (1970) 255 Ind. 360, 264 N.E.2d 607. We perceive the only issue preserved for review to be whether it is contrary to law for Bruhn to receive stock in exchange for the difference between the fair market value of the equipment and the allocated encumbrances on the equipment which the corporation assumed.

Ind.Code 23–1–2–6(e) provides in relevant part:

(e) Payment for Shares. The consideration for the issuance of shares of any corporation may be paid, in whole or in part, in money, in other property, tangible or intangible, or in labor actually performed for, or services actually rendered to the corporation . . . . *In the absence of actual fraud* in the transaction, *the judgment of the board of directors as to the value of such property*, labor, or services received as consideration, or the value placed by the board of directors upon the corporate assets in the event of a share dividend *shall be conclusive.* [Emphasis added.]

There is evidence in the record to support the trial court's determination that Garbe and Holloway at least acquiesced in the valuation method for Bruhn's stock out-

1. Moldcraft Tool, Inc. later changed its name to Excel Mold, Inc.

2. Of course, the tax consequences are an entirely different matter. Bruhn's advisors completed a Section 351 (Internal Revenue Code) transaction whereby Bruhn transferred the assets to the corporation. If done properly there is no gain or loss recognized on the transfer. The basis to the corporation of the equipment

would be the same as Bruhn's, that is to say, cost, not fair market value. Due to encumbrances, Bruhn's basis of the stock would be zero. Upon selling the stock, Bruhn would be finally taxed on his benefit of the bargain.

The tax consequences, however, are, in a sense, irrelevant to the corporate law aspects of this case.

lined to them. Minutes of the Board of Directors, which included Garbe and Holloway, show the Board approved the $151,800 valuation. Garbe and Holloway essentially ask us to reweigh the evidence on this issue, which, of course, we can not do. A negative judgment will be reversed on appeal only where the evidence is without conflict and leads to but one conclusion. *Umbreit v. Chester B. Stem, Inc.* (1978) Ind.App., 373 N.E.2d 1116. We cannot say that there is unconflicting evidence which points towards fraud here; indeed, we find nothing reprehensible about the transactions conducted. The appraisal was done by a disinterested expert and it was not questioned at trial. We are aware that a shareholder of a close corporation stands in a fiduciary relationship to other shareholders, and as such, must deal fairly, honestly and openly with his corporation and fellow stockholders. *Motor Dispatch, Inc. v. Buggie* (1978) Ind. App., 379 N.E.2d 543, 547; *Hartung v. Architects Hartung/Odle/Burke, Inc.* (1973) 157 Ind.App. 546, 301 N.E.2d 240. The appraisal, however, was fair and the valuation method was disclosed to the minority shareholders.

Finding no error, we affirm.

NEAL, J., and BUCHANAN, C. J. (sitting by designation), concur.