[No. 3048–2–III.   Division Three.   January 15, 1980.]

GEORGE G. DULLANTY, ET AL, *Appellants,* v. COMSTOCK
DEVELOPMENT CORPORATION, *Respondent.*

*Robert M. Brown* and *Brown, Thayer & Drummond,* for appellants.

*Terence R. Whitten* and *Lukins & Annis,* for respondent.

McINTURFF, J.—George and Doris Dullanty appeal the dismissal of their action for specific performance of an earnest money agreement.

On April 20, 1975, George Dullanty offered to purchase an unimproved lot from the respondent, Comstock Development Corporation (Comstock), by signing an earnest money receipt and agreement. The agreement was partially printed and partially typed.

The typed portion of the agreement described the property (Lot 28), the price, and the manner of payment. The purchase price was $8,287.50, payable as follows:

$200.00 Earnest Money Receipted above to be applied to the down payment

$628.75 further down payment to be paid in cash *at closing which will be no later than thirty days after the paving and curbing is finished*

$7458.75 is to be paid by the purchaser in three equal payments out of the 1st three construction draws

(Italics ours.)

An appendix to the earnest money agreement further provided:

IV. Purchaser–builder agrees to commence construction of a dwelling for speculative sale within 60 days after closing date and to proceed with such construction as expeditiously as possible.

While the paving and curbing in the Comstock development was completed sometime in the spring of 1975, neither party took any steps to close the sale until approximately 2 years later. Throughout this time, Mr. Dullanty was actively engaged in the construction of other new homes in the Comstock development.

During this time, Mr. Dullanty also worked closely with James S. Black real estate company, the same company that prepared the earnest money agreement in question. The owner of the real estate company, James S. Black, was also the president of Comstock Development Corporation. Pursuant to a clause in the April 20, 1975, agreement, sales agents for James S. Black devoted their efforts to securing potential customers for a custom–built home on Lot 28 in the hope of earning a real estate commission.[1]

In July 1977, Mr. Dullanty submitted architectural plans for Lot 28. At that time, he was informed by Mr. Black that Comstock would not sell the lot for the price stated in the earnest money agreement, but would consider a sale for approximately double its original agreement.

---

[1]The appendix to the earnest money agreement further provided:

". . . As a further and material consideration, purchaser agrees to give an EXCLUSIVE RIGHT TO SELL LISTING on the property to JAMES S. BLACK AND COMPANY for a period of not less than six months with a minimum of 120 days after final completion of the dwelling unit on the herein described lot. Purchaser further agrees that since JAMES S. BLACK AND COMPANY will be responsible for the sale of the speculative house that they will counsel with them as to plan, layout, price, and terms before commencing construction. Purchaser–Builder further agrees that any contract for a custom house which is obtained by the builder due to the activities of the agent in showing the house or by a purchaser who has contacted the builder as a direct result of seeing this house that the customary commission rate will be due and payable to JAMES S. BLACK AND COMPANY on the sale of said custom house."

In a letter to Comstock dated August 5, 1977, Mr. Dullanty agreed to tender, in full, the remaining balance of the original purchase price—"$8,087.50 *for property warranty deed and title policy.*" James S. Black responded on behalf of Comstock informing Mr. Dullanty the agreement was terminated due to the 2–year delay in closing.

■ Mr. Dullanty then commenced this action for specific performance of the earnest money agreement. The trial court dismissed the action, finding Mr. Dullanty had failed to promptly satisfy *his burden* of closing the transaction. The agreement was terminated and the $200 earnest money paid by Mr. Dullanty was forfeited as liquidated damages. Comstock argues we are bound by the decision of the trial court because there is substantial evidence to support the finding that Mr. Dullanty failed to satisfy *his burden* of closing the transaction and commencing construction within the stated time periods. The proper designation for this finding, however, is a conclusion of law, subject to review by this court as a question of law. *Local 1296, Int'l Ass'n of Firefighters v. Kennewick,* 86 Wn.2d 156, 162, 542 P.2d 1252 (1975); *King v. Seattle,* 84 Wn.2d 239, 250, 525 P.2d 228 (1974). We find the court erred in its disposition and therefore reverse.

The contract required the seller to provide a policy of title insurance "as soon as procurable."[2] The sale was to be

[2]The following printed provisions appear in the agreement:

"2. *Seller shall make available to purchaser at office of closing agent as soon as procurable, a standard form purchaser's policy of title insurance or report preliminary thereto issued by Pioneer National Title Co.* and seller authorizes agent to apply at once for such title insurance. . . . If title is not so insurable as above provided and cannot be made so insurable by termination date set forth in Paragraph 8 hereof, earnest money shall be refunded and all rights of purchaser terminated; Provided that purchaser may waive defects and elect to purchase. *If title is so insurable and purchaser fails or refuses to complete purchase, the earnest money shall be forfeited as liquidated damages unless seller elects to enforce this agreement.* The agent shall not be responsible for delivery of title." (Italics ours.)

closed "within a reasonable time *after*" delivery of a policy showing insurable title.[3] (Italics ours.)

The forfeiture clause of the earnest money agreement stated: "If title is so insurable and the purchaser fails or refuses to complete the purchase, the earnest money shall be forfeited as liquidated damages."[4] Thus, under the terms of the parties' agreement, Comstock's obligation to procure a policy of title insurance was a condition precedent to Mr. Dullarty's obligation to perform under the contract. *See Kolosoff v. Turri*, 27 Wn.2d 81, 82, 89, 176 P.2d 439 (1947). As the court in *Kolosoff* observed at page 87:

"Before the respondents were in a position to declare the contract at an end, and to put the appellant in default, it was necessary for the respondents to *tender an abstract of title* showing clear title, and *notify* the appellants to make payment within a reasonable time, or the contract would be rescinded by the respondents. The obligation of the appellant to pay the purchase money depended upon the duty of the respondents to tender to the appellant an abstract of title showing clear title. It is not claimed on the part of the respondents that they ever offered to perform the contract on their part with reference to *tendering an abstract of title* showing clear title to the property sold, and without such offer they are not in a position to rescind the contract and defeat the plaintiff's action to compel a specific performance thereof."

---

[3] "8. *The sale shall be closed* in the office of Paul Clausen *within a reasonable time after insurance policy or report preliminary thereto is delivered showing title insurable,* as above provided, or after completion of financing, if financing is called for herein, whichever is later. *The purchaser and seller will, on demand, deposit in escrow with the closing agent, all instruments and monies necessary to complete the purchase in accordance with this agreement;* the cost of escrow and/or closing agent's fee shall be paid one–half each by seller and purchaser." (Italics ours.)

[4] See footnote 2.

(Some italics ours.) Quoting from *Kessler v. Pruitt,* 14 Idaho 175, 93 P. 965 (1908).

Comstock argues delivery of the title insurance policy would have been a "useless act." We disagree. Unlike *Artz v. O'Bannon,* 17 Wn. App. 421, 562 P.2d 674 (1977), where the purchaser's inability to obtain money for the down payment excused the condition precedent of delivery of the title insurance policy by the seller, Mr. Dullanty said he would have moved onto the lot and commenced construction rather than face a forfeiture of the earnest money agreement.[5]

> Forfeitures are not favored in the law, and courts will promptly seize upon any circumstances arising out of the contract or the actions or relations of the parties in order to avoid a forfeiture.

*Moeller v. Good Hope Farms, Inc.,* 35 Wn.2d 777, 782, 215 P.2d 425 (1950), quoting from *Wadham v. McVicar,* 115 Wash. 503, 197 P. 616 (1921). Here, the parties were in close contact in their respective efforts to develop the Comstock Park Addition during the 2–year hiatus following execution of the earnest money agreement. While the contract stated time was of the essence, the inaction of the parties is indicative of some understanding or waiver of the essence clause.[6] Under these circumstances, Mr. Dullanty did not forfeit his rights under the earnest money agreement by awaiting the performance of a condition precedent by Comstock.

---

[5]Mr. Dullanty testified:

"Q. Is it fair to say, Mr. Dullanty, that until approximately the time of Mr. Brown's letter you were really too busy to move onto this job?

"A. No, that isn't true. If we had had to, we could have moved on it any time."

[6]*See Townsend v. Rosenbaum,* 187 Wash. 372, 395, 60 P.2d 251 (1936); *Gibson v. Rouse,* 81 Wash. 102, 107, 142 P. 464 (1914); *Tacoma Water Supply Co. v. Dumermuth,* 51 Wash. 609, 614–15, 99 P. 741 (1909).

174

Judgment of the Superior Court is reversed.

GREEN, C.J., and ROE, J., concur.

Reconsideration denied February 28, 1980.