W & W EQUIPMENT CO., INC., Frank D. Wraight, Albert B. Winter, and James M. Secrest, Defendants-Appellants,

v.

Donald W. MINK, Plaintiff-Appellee.

No. 49A02-8902-CV-55.[1]

Court of Appeals of Indiana,
First District.

March 18, 1991.

Rehearing Denied May 10, 1991.

---

**1.** This case was reassigned to this office on January 2, 1991.

John F. Ittenbach, Sheeks & Ittenbach, Steven G. Cracraft, Stewart & Irwin, Indianapolis, for defendants-appellants.

John Van Winkle, Nana Quay–Smith, Bingham, Summers, Welsh & Spilman, Indianapolis, for plaintiff-appellee.

BAKER, Judge.

Defendant-appellants W & W Equipment Co., Inc., Albert Winter, James Secrest, and Frank Wraight appeal the trial court's judgment in favor of plaintiff-appellee Donald Mink in this action for involuntary dissolution of a corporation, and damages for breach of a fiduciary duty. We affirm.

## ISSUES

Winter, Secrest, and Wraight present numerous issues for our review which we restate as follows [2]:

I. Whether the trial court erred in amending its findings of fact and conclusions of

---

**2.** W & W Equipment Co., Inc., Winter, and Secrest filed their appellant and reply briefs jointly, while Wraight filed his own appellant and reply briefs.

law 224 days after the court entered its initial judgment.

II. Whether Wraight, as a director, owed a fiduciary duty to Mink as an individual shareholder.

III. Whether Winter, Secrest, and Wraight breached their fiduciary duties to Mink.

IV. Whether Wraight proximately caused Mink's damages.

V. Whether Mink should be denied a remedy under the doctrine of unclean hands.

VI. Whether the trial court properly resolved the case by dissolving the corporation and awarding damages to Mink.

## FACTS [3]

This case, about a small corporation and its demise, can best be understood by realizing that at the heart of the dispute we have a disagreement about who will receive the benefit of the corporation's assets. In particular, the question is whether it will be the retiring shareholder Winter who wants a large final return from his lifelong investment, or the relatively new shareholder Mink, brought in to sustain the business, who wants the money to stay in the corporation for its continuation.

Winter and Wraight entered into a partnership in 1960, as manufacturers' representatives for waste water treatment equipment. The partnership was incorporated as W & W Equipment in the late 1960s. Winter had a business degree and experience in the waste water treatment field, and Wraight was an engineer. Mink, an engineer, was sought out and hired in 1977 when Wraight began to consider retirement. Wraight and Winter desired a new younger engineer to join the company to take Wraight's place.

In January of 1980, the new W & W Equipment Co., Inc. (W & W) was formed. Winter and Wraight each owned 40% of the stock of this new corporation, and Mink owned 20% of the stock. Each shareholder

was both an officer and a director of W & W. Secrest, legal counsel for W & W, was named the fourth director and officer of W & W. W & W was capitalized in part by a loan from the old corporation, which continued to receive the income generated from accounts set up before W & W came into existence.

Wraight retired in 1984, and his shares of stock were redeemed by the corporation at book value. The price was established by a letter from Secrest, the corporate attorney, informing the shareholders the price for Wraight's shares was the stock's book value as of the date of the closing of the corporation's prior fiscal year, as provided for in the stock purchase agreement. Mink and Winter purchased these shares in a manner such that each became a 50% shareholder of the corporation. Wraight went off the payroll, and moved to California. He remained a member of the board of directors of W & W to protect his personal interest in the loan from the old corporation to W & W, and was to step down from the board upon repayment of the loan.

Winter indicated he would be retiring in 1987, and based upon this plan Mink entered into negotiations with Henry P. Thompson Co. (HPT) to establish a joint venture. In 1985, the joint venture was formed. Its board of directors consisted of Winter, Mink, and two individuals from HPT. The joint venture was established on the premise Winter would retire in 1987. Winter opposed but did not veto the joint venture, which was financially successful.

In early 1986, a dispute arose between Mink and Winter concerning Winter's retirement, in particular concerning the valuation of Winter's stock. Mink initially proposed valuing Winter's stock at book value, which was approximately $15,000 at that time, and he eventually offered to pay Winter $50,000 for the stock. Winter wanted to be paid $250,000 for his shares, because he believed he should receive one half the

---

**3.** The facts of this case are largely undisputed. As discussed below, we are to consider only the evidence in the record which supports the judgment, along with the reasonable inferences to

be drawn from the evidence. *See Craig v. ERA Mark Five Realtors* (1987), Ind.App., 509 N.E.2d 1144.

value of the corporation upon his retirement. Secrest did not write the same letter regarding Winter's stock as he did with Wraight's stock, and instead informed the parties that the stock purchase agreement had no application to Winter's retirement. During the negotiations, Winter indicated that if Mink did not pay him the price he wanted, he would simply remove Mink from the business, open up a post office box to collect the accounts receivable, and receive the amount of money he wanted in that manner.

On March 9, 1987, a Waiver of Notice and Consent to Action by the Board of Directors was prepared by Secrest for Wraight. The notice requested Wraight's consent to the removal of Mink as a director of the joint venture and his removal as an officer and signatory for W & W. Wraight signed the consent. Neither Winter nor Secrest, who communicated with Mink frequently during this time, mentioned the waiver to Mink. The notice of the board meeting for these purposes was sent to Mink's home while he was vacationing out of the state. Prior to the board meeting, checks for final payment of the loan from the old corporation were drafted, but Winter voided the checks. Wraight thus remained a director of the corporation.

Winter informed the HPT members of the joint venture that he was going to take control of W & W. This information led to the termination of the joint venture by the HPT members. Nine days after the joint venture termination, the W & W board meeting was held. In a summary fashion with no discussion, Secrest and Winter voted to remove Mink as an officer and signatory for W & W and as director of the joint venture. Wraight's vote for Mink's removal, obtained by consent, was also counted. Mink cast the sole vote against his removal. Mink immediately filed the lawsuit which is the subject of this appeal.

After the lawsuit was filed, Winter terminated Mink as an employee of W & W. Mink continued to come to work for a period of time, and Winter sought and obtained a temporary restraining order without notice to prevent Mink from coming to work.

This order was obtained from a different judge than was already assigned to the pending lawsuit, and the temporary restraining order judge was not informed by Winter or Secrest that there was a pending lawsuit involving these parties or that Mink was a 50% shareholder of W & W. Winter subsequently increased his own salary and began winding up the corporation. W & W never paid a dividend to its shareholders. As stated in Winter and Secrest's brief, Winter has received $113,015.97 from W & W and Mink has received $18,000 since the filing of this action, and as of May 31, 1988, W & W had $386,421.63 in remaining assets.

Mink's lawsuit sought compensatory damages from Winter, Wraight, and Secrest for breach of fiduciary duty, and sought dissolution of W & W. Mink also sought punitive damages against Winter and Secrest. Winter, Wraight, and Secrest filed a counterclaim against Mink alleging breach of fiduciary duty and conversion of corporate funds. After a bench trial, the trial court entered lengthy findings of fact and conclusions of law pursuant to Mink's request. The court found Mink had suffered a loss of $420,000. Mink was awarded W & W's remaining assets of $386,421.63, and a judgment in the amount of $33,578.37 against Winter, Wraight, and Secrest, for a total of $420,000. Punitive damages in the amount of $20,000 were imposed against Winter and Secrest. The court ordered that W & W be dissolved. Finally, the court found in favor of Mink on the counterclaim against him.

### DISCUSSION AND DECISION

 We first note the deferential standard of review we are to employ in this case. The trial court entered special findings of fact and conclusions of law upon Mink's motion. When the trial court enters special findings, this court applies a two-tier standard of review. *Kaminszky v. Kukuch* (1990), Ind.App., 553 N.E.2d 868, *trans. denied.* We first determine whether the evidence supports the findings, and then determine whether the findings support the judgment. *Id.* Special findings

and the judgment flowing from the findings will be set aside only if they are clearly erroneous. *Id.;* Ind.Trial Rule 52(A). In determining whether the findings and judgment are clearly erroneous, this court will neither reweigh the evidence nor judge the credibility of the witnesses. *Craig, supra.* We consider only the evidence in the record which supports the judgment along with the reasonable inferences to be drawn from the evidence. *Id.* This court will disturb the trial court's findings only if the record is devoid of facts or inferences to support the findings. *Id.*

### I. *Amendment of findings.*

■ We first dispose of a procedural issue. Winter and Secrest contend the trial court erred in amending its findings of fact and conclusions of law. The court entered its findings, conclusions, and judgment on September 1, 1988. Winter, Secrest, and Wraight filed their motions to correct error on October 28, 1988, and the court heard argument on these motions on March 28, 1989. On April 27, 1989, the court entered corrected findings of fact and conclusions of law, but did not alter its previously entered judgment, and denied the motions to correct error.

Ind.Trial Rule 52(B) provides that in a case tried without a jury, the court may, at any time before a motion to correct error or with or as part of any motion to correct error, amend findings and enter a new judgment. Winter and Secrest argue they did not request the precise changes made by the court, so there was no basis for the court's action. We find this argument unpersuasive.

Simply because the trial court did not make the changes they wanted does not mean there was no basis for the trial court's action. There was a motion to correct error outstanding, and the trial court amended its findings. There was no error. *See Indiana & Michigan Electric Co. v. Harlan* (1987), Ind.App., 504 N.E.2d 301, *trans. denied* (noting T.R. 52(B) allows trial court to make new findings or enter a new judgment at least up to and including the ruling on the motion to correct error)

*and State ex rel. Jackson v. Owen Circuit Court* (1974), 160 Ind.App. 685, 314 N.E.2d 73 (trial court may change its record at any time until it rules on a motion to correct error).

### II. *Existence of fiduciary duty.*

Winter, Secrest, and Wraight argue the trial court's finding that they breached their fiduciary duties to Mink is contrary to law and unsupported by the evidence. Before we can determine whether there was a breach of a fiduciary duty, we must determine whether the fiduciary duty exists.

■ A close corporation is one which typically has relatively few shareholders and whose shares are not generally traded in the securities market. O'Neal & Thompson, *O'Neal's Close Corporations* § 1.02 (3rd ed.). W & W is a close corporation, as it has only two shareholders, and the shares are not publicly traded. Shareholders in a close corporation stand in a fiduciary relationship to each other, and as such, must deal fairly, honestly, and openly with the corporation and with their fellow shareholders. *Krukemeier v. Krukemeier Machine and Tool Co., Inc.* (1990), Ind.App., 551 N.E.2d 885; *Garbe v. Excel Mold, Inc.* (1979), Ind.App., 397 N.E.2d 296. Winter, as a fellow shareholder, owes a fiduciary duty to Mink, and he does not argue otherwise.

Wraight was only a director of W & W at the time of the events in question, not a shareholder. He argues that under Indiana law, a director owes a fiduciary duty to the corporation and its shareholders, and that a suit may be brought by the corporation or the shareholders derivatively for a director's breach of his fiduciary duty. He contends, however, that a director owes no duty to individual shareholders. In other words, Wraight argues Mink should have brought a derivative action instead of an individual action.

■ We do not quarrel with Wraight's statements as a general matter. The well-established general rule is that shareholders of a corporation cannot maintain actions in their own name to redress an inju-

ry to the corporation. *Moll v. South Central Solar Systems, Inc.* (1981), Ind.App., 419 N.E.2d 154. A single derivative action is generally required in order to further sound policy considerations, one of which is the avoidance of multiple shareholder lawsuits. *Id.* "It is recognized that authorization of shareholder actions [in their own names] would constitute authorization of multitudinous litigation and disregard for the corporate entity." *Id.* at 161. Other reasons underlying the general rule that shareholders are limited to bringing a derivative action include: the protection of corporate creditors by putting the proceeds of the recovery back in the corporation; the protection of the interests of all the shareholders rather than allowing one shareholder to prejudice the interests of other shareholders; and the adequate compensation of the injured shareholder by increasing the value of the shares when recovery is put back into the corporation. *Caswell v. Jordan* (1987), 184 Ga.App. 755, 362 S.E.2d 769, *cert. denied.*

■ The reasons for requiring a derivative action are not present in this case. There are only two shareholders, and Mink is the sole injured shareholder. There is thus no potential for a multiplicity of shareholder suits; there is no evidence of any creditor in need of protection; there can be no prejudice to other shareholders not a party to the suit since Mink is the only injured shareholder; and Mink would not be adequately compensated by a corporate recovery because W & W is a close corporation with no ready market for the sale of Mink's shares. Because none of the underlying reasons for requiring a derivative action are present here, we hold that Mink was not required to bring a derivative action. *See Caswell, supra.*

To prevent unwarranted concern on the part of non-shareholder directors concerning their liability to individual shareholders in a close corporation, we note that we do not hold that a derivative action is unnecessary if the aggrieved parties are in a close corporation. Our holding is, rather, that the trial court did not err in allowing this cause of action to proceed absent compli-

ance with the derivative requirements because there were only two shareholders, one of whom was involved in the breach of fiduciary duty. There was thus only one shareholder who could bring the action on behalf of the corporation. While the better practice would be to bring a derivative action, we will not exalt form over substance in this case.

In addition, we note that to maintain a derivative action, the person must have been a shareholder at the time of the complained of transaction, the person must fairly and adequately represent the interests of the shareholders, and the complaint must be verified and allege that demand was made to obtain action by the board of directors, or allege why demand was not made. IND.CODE 23–1–32–1 to –2. Mink would not have had difficulty satisfying any of these requirements. This case is thus not a case where a shareholder is trying to avoid the requirements of a derivative action because the shareholder cannot meet the requirements for such an action.

### III. *Breach of fiduciary duty.*

Having found Winter, Secrest, and Wraight owed a fiduciary duty to Mink, we now turn to the issue of whether that duty was breached. They argue the court improperly based its decision that they breached their duty to Mink on Mink's termination from his job, and on the existence of a tort action for freeze-out. Mink counters that the trial court simply found they breached their fiduciary duty, and did not base this upon a wrongful termination or a freeze-out tort theory.

■ The nature of the fiduciary duty is the same regardless of whether it arises in the capacity of a director, officer, or shareholder in a close corporation. *Hartung v. Architects Hartung/Odle/Burke, Inc.* (1973), 157 Ind.App. 546, 301 N.E.2d 240, *trans. denied.* "The fiduciary must deal fairly, honestly and openly with his corporation and fellow stockholders. He must not be distracted from the performance of his official duties by personal interests." *Id.,* 157 Ind.App. at 552, 301 N.E.2d at 243. Because the trial court entered special find-

ings pursuant to Mink's request, this court cannot affirm the trial court's judgment on any grounds supported by the evidence, but must determine whether the specific findings are adequate to support the trial court's decision. *Willett v. Clark* (1989), Ind.App., 542 N.E.2d 1354.

■ The trial court's findings relative to a breach of fiduciary duty include the following:

10. Al Winter made statements that he would retire by March, 1987 before and after the date of Mr. Wraight's retirement.

17. Al Winter was informed by W & W's accountant that his stock value ranged from $15,000 to $250,000 with $15,000 being book value and $250,000 being ceiling price, and Al Winter did not tell Don Mink of this price range. Winter merely set the price of his stock at $250,000.

18. Mr. Secrest wrote the proposal of Al Winter setting his stock price at $250,000 in response to Mr. Winter's request that he draw up a legal document and review his proposal.

19. Mr. Secrest also advised Mr. Winter of his options regarding Winter's negotiations with Don Mink, and drafted the language of a letter for Al Winter which denied a shareholder meeting.

20. Mink offered to retire Al Winter's stock by the same method employed by W & W when Frank Wraight retired which was payment of book value for the shares.

21. Mr. Winter threatened Don Mink in the presence of all the directors that if Mr. Mink did not pay Al Winter $250,000 for his stock, then Mr. Winter would hold his stock, not come to work, go to court.

22. Mr. Secrest also told Mr. Mink that Al Winter could leave the office, not retire stock, open up a post office box and collect income from W & W.

23. The negotiations continued between Al Winter and Mr. Mink until March, 1987 without resolution.

26. Mr. Winter voided the checks paying off [the loan to the old corporation] on March 19, 1987, without consulting Frank Wraight who, if consulted, would have resigned as a director of W & W and taken the check.

27. On March 9, 1987, Al Winter and Jim Secrest prepared a "Waiver of Notice and Consent To Action By the Board of Directors" for Frank Wraight, and this Notice and Consent was to remove Don Mink from the Joint Venture Board, as an officer of W & W, and as a signatory for W & W.

28. The Notice and Consent was sent to Wraight on March 9, 1987 by Secrest and on the same day Mr. Secrest corresponded with Mr. Mink regarding Mr. Mink's proposal for voluntary dissolution, and in Secrest's letter to Mink the planned removal of Don Mink was not disclosed by Secrest.

29. [W & W's secretary] called Mr. Wraight between March 9, 1987, and March 16, 1987 to ask what Mr. Wraight's position was on the Waiver and Consent, and Mr. Wraight signed the Waiver and Consent on March 16, 1987.

30. On March 19, 1987, Al Winter corresponded with Mr. Mink, and no disclosure was made of the Waiver and Consent, or the plan to remove Mr. Mink even though the Waiver and Consent had been mailed to Wraight 10 days earlier.

31. Between the last week of March, 1987 and April 4, 1987 notice of the plan to remove Don Mink was mailed to his home while he was away on vacation in Florida.

33. While Mink was on vacation between the last week in [March], 1987, and April 4, 1987, Mr. Winter told Mr. Cantwell that Don Mink was going to be surprised when he came back because Mr. Winter was going to take control.

35. On April 10, 1987 a board meeting of W & W was held in Secrest's office to remove Mr. Mink as an officer of W & W, director of the joint venture, and a signatory of W & W.

37. At the April 10, 1987 meeting, no discussions were allowed regarding the reasons for the removal, W & W's interest, and the propriety of the removal of

Mr. Mink, and no answers were given to the questions of Mr. Mink.

39. On April 13, 1987 Don Mink was fired from W & W and Al Winter issued a check to Mr. Mink for $2,264.38.

40. Mr. Secrest had conferred with Al Winter about Mink's upcoming termination.

41. Al Winter terminated Mr. Mink because he was mad at Mr. Mink for seeking dissolution of W & W, and Al Winter and Jim Secrest did not notify Mr. Mink of Winter's intention to fire him[,] for Mr. Mink first learned of his termination from the termination notice sent by Mr. Winter.

44. Al Winter threatened to call the sheriff on Mr. Mink if he kept working for W & W.

48. Al Winter threatened to use the judicial process against Mr. Mink by drawing out the case.

49. Al Winter threatened to use the judicial process against Mr. Mink by keeping the case in court for up to six years by bouncing it from county to county while at the same time drawing salary in an amount up to $500,000 which would be possible as long as there was money coming in, for then the business could remain open and ongoing.

50. Al Winter sought and was granted a T.R.O. without notice to prevent Mr. Mink from working.

56. Mr. Sheeks and Mr. Secrest did not tell [the T.R.O. judge] that Don Mink was a 50% owner of W & W.

57. Mr. Sheeks and Mr. Secrest omitted telling [the T.R.O. judge] that they were seeking a T.R.O. without notice while there was a case already pending.

66. The reasons the Defendants gave for the removal and termination of Mr. Mink were that he was engaging in shoddy business practices and that after the termination of the joint venture Mr. Winter could handle the wind down of W & W's business.

67. After termination of Don Mink and his removal, Mr. Winter gave himself a $20,000 raise to wind down the business of W & W.

69. Don Mink was terminated and removed from W & W so that Al Winter could receive the amount he wanted from his stock by collecting salary off the accounts receivable of W & W.

*Record* at 511–17.

Winter, Wraight, and Secrest do not argue the findings quoted above are unsupported by the evidence; rather they contend the findings do not support the judgment that they breached their fiduciary duty to Mink. We do not agree. The findings recited above indicate Winter, Wraight, and Secrest were not honest with Mink. In addition, Winter and Secrest were less than honest with the T.R.O. judge about the situation at W & W. The trial court found Winter, Wraight, and Secrest schemed to remove Mink from W & W without discussing their plans with him. They timed the notice to be sent to his home while he was on vacation in order to give him as little notice as possible of the upcoming action. The trial court's findings demonstrate Winter was not honest with Mink about the value of his stock; as stated above Winter simply demanded $250,000 for his stock and did not inform Mink that this price was the upper limit given to him by the accountant. Secrest gave different advice about Winter and Wraight's sale of their stock upon retirement without explaining why the situations were different. Winter threatened to use the courts against Mink to bleed the company of its assets. The trial court found Winter terminated Mink simply to get him out of the way, and then Winter began paying himself more money. These actions do not constitute dealing "fairly, honestly and openly with [the] corporation and fellow stockholders." *Hartung, supra,* 157 Ind. App., at 552, 301 N.E.2d at 243.

"Once it is established that one with a fiduciary duty has attempted to benefit from a questioned transaction, the law presumes fraud." *Dotlich v. Dotlich* (1985), Ind.App., 475 N.E.2d 331, 342, *trans. denied.* The burden of proof then shifts to the fiduciary to overcome the presumption by showing his actions were honest and in good faith. *Id.* Winter argues

on appeal that he had a clear business reason for not wanting to sell his stock to Mink in 1987: the book value of his stock was only $11,500 in 1987, but in March of 1988 it would be worth $190,000. *Appellant Winter's Brief* at 32–33. In his Statement of Facts however, Winter states he wanted $250,000 from Mink because he believed that to be one half of the value of the corporation. *Appellant Winter's Brief* at 12. Even if Winter had a clear business reason for holding out on the sale of his stock until its book value went up, he breached his fiduciary duty. There is nothing to indicate Winter told Mink of this plan; Winter simply demanded $250,000 from Mink without explaining how the accountant came up with a range of figures, $250,000 being the high end of the range. That can hardly be considered honesty and fair dealing on the part of Winter. Winter, Wraight, and Secrest made no showing of good faith and honesty in their actions. The trial court's judgment was not clearly erroneous, and we will uphold that judgment.

■ Winter, Wraight, and Secrest argue the trial court erroneously found the termination of Mink was a breach of their fiduciary duty because an employee at will can be discharged without cause. As a general rule, employment relationships in Indiana are terminable at the will of either party. *Speckman v. City of Indianapolis* (1989), Ind., 540 N.E.2d 1189. There are exceptions to this rule which are not applicable in this case. The trial court did not allow Mink a cause of action for wrongful termination, however. It simply found that aspects of the way Mink was terminated were dishonest, thus causing a breach of the fiduciary duty owed to him. The findings indicate Mink's termination was part of an overall scheme to allow Winter to receive a desired amount of money upon his retirement.

As noted by the Massachusetts Supreme Court, the denial of employment to a minority shareholder in a close corporation "is especially pernicious in some instances." *Wilkes v. Springside Nursing Home, Inc.* (1976), 370 Mass. 842, 353 N.E.2d 657, 662.

A minority stockholder typically depends on his salary as the principal return of his investment, since the earnings of a close corporation are mainly distributed as salaries, bonuses, and retirement benefits. *Id.* W & W never issued a dividend, so the only return the shareholders received was through employment and the sale of their stock. The trial court did not allow Mink to pursue an action for wrongful termination; it simply recognized his termination as one aspect of the overall unfair and dishonest scheme to obtain the money Winter wanted.

Winter, Wraight, and Secrest also argue the court erred by entering judgment for Mink on a "freeze-out" or "squeeze-out" theory, because Indiana does not recognize such a theory. Mink again contends the trial court did not base its decision on any certain theory, but rather on the entirety of their actions.

Our supreme court has defined a freeze-out as the use of corporate control vested in the statutory majority of shareholders or the board of directors to eliminate minority shareholders from the enterprise or reduce their voting power or claims on corporate assets to relative insignificance. *Gabhart v. Gabhart* (1977), 267 Ind. 370, 370 N.E.2d 345. A freeze-out implies a purpose to force upon the minority shareholder a change which is not incident to any other corporate business goal. *Id.* The court noted the problem with these types of transactions is the difficulty of reconciling conflicting policies consistent with the general goals of maximum shareholder benefits and equality of treatment. *Id.* "On the one hand is the necessity to provide adequate protection for the interests and expectations of minority shareholders, and the other is the necessity of allowing sufficient corporate flexibility, as is required by modern commerce." *Id.*, 267 Ind. 370 at 383–84, 370 N.E.2d at 353–54.

■ The issue in *Gabhart* was whether a shareholder was limited to statutory appraisal rights when a corporate merger was not motivated by a valid business purpose. Our supreme court held that in a bona fide merger proceeding, a dissenting

or non-voting shareholder is limited to the statutory means for the realization of equity, but that if a proposed merger has no valid business purpose and would eliminate or reduce minority shareholders, the shareholders may challenge the action as a de facto dissolution. *Gabhart, supra.* Thus, if a corporation is being dissolved for the benefit of selected shareholders, rather than being merged for corporate purposes, the affected shareholders are not limited to appraisal rights, but may have dissolution carried out by the statutorily provided method. *Id.*

Although the court indicated it did not believe the judiciary should intrude into corporate management to the extent of reviewing every proposed merger for fairness to minority shareholders, it did not say, as Winter, Wraight, and Secrest contend, that Indiana does not recognize freeze-out transactions as a breach of fiduciary duty. *Id.* The court stated it is the policy of the law to leave corporate affairs to the control of corporate agencies *"except in a plain case of fraud, breach of trust, or such maladministration as works a manifest wrong to [the shareholders]." Id.,* 267 Ind. 370 at 381–82, 370 N.E.2d 345 at 353 (emphasis in original). We do not read *Gabhart* as prohibiting the trial court's judgment that the actions in this case arose to the level of a breach of fiduciary duty.

 In addition to the arguments dealt with above, Wraight argues he did not breach his duty to Mink because all he did was sign the Waiver of Notice and Consent To Action. Generally, a director is not liable for the misconduct of a co-director. *Dotlich, supra.* An exception occurs, however, when the director actually participates in the wrongdoing. *Id.* A director will also be liable if he learns of a co-director's misdeeds and either takes no action or acquiesces in the misdeeds. *Id.* Wraight signed the notice of waiver and

consent in this case. He was aware that Mink was to be removed, and indeed, he participated in Mink's removal by signing the consent. He cannot now say he had nothing to do with the removal of Mink, or that he knew nothing about misconduct on the part of Winter. A director cannot blindly take action and later avoid the consequences by saying he was not aware of the effect of the action he took. A director has some duty to become informed about the actions he is about to undertake. *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858 (1985).

"To avoid liability 'it is incumbent upon a corporate director, on learning facts sufficient to put a prudent man on guard, to take the appropriate action under the circumstances.'" *Dotlich, supra,* at 343, (quoting *Graham v. Allis–Chalmers Manufacturing Co.* (1963), 41 Del.Ch. 78, 188 A.2d 125). When presented with the waiver and consent, Wraight had some duty to inquire further before consenting to the action. This is so particularly in light of the facts that Winter and Secrest proposed to remove Mink, a director, officer, and 50% shareholder of the close corporation who was brought into the corporation in order to provide continuity for W & W and who had recently completed a joint venture which was a financial success for W & W. The trial court did not err in finding Wraight breached his fiduciary duty to Mink.[4]

## IV. *Proximate cause.*

 Wraight also argues he did not proximately cause Mink's damages and cannot be liable for them. He cites *Huey v. Milligan* (1961), 242 Ind. 93, 175 N.E.2d 698 and *Jackson v. Warrum* (1989), Ind. App., 535 N.E.2d 1207 for the proposition that Mink must demonstrate Wraight's actions or inactions were a substantial contributing factor to Mink's loss. The removal of Mink from his positions at W & W

---

**4.** Wraight argues the signing of the waiver of notice and consent to action was a nullity because IND.CODE 23–1–34–2 prohibits action by consent unless there is unanimous consent, which there was not here. The procedural aspects of the action itself have not been challenged, however. Mink was removed, and Wraight's signature on the waiver and consent was part of that removal. Wraight thus participated in the scheme to remove Mink, in breach of his fiduciary duty.

caused the breakdown of the profitable joint venture, and caused the removal of Mink from the business in which he was a 50% owner and into which he had put much work. Wraight participated in this removal by signing the waiver and consent to action. The trial court did not err in finding Wraight liable to Mink, because Wraight's actions were a substantial contributing factor to Mink's loss.

## V. Unclean hands.

■ Winter, Wraight, and Secrest argue that Mink breached his fiduciary duty to them, and thus should not be able to recover in court due to his own unclean hands. It is correct that one who comes before the equity court must do so with clean hands. *Halliday v. Auburn Mobile Homes* (1987), Ind.App., 511 N.E.2d 1086.

■ This issue was not presented to the trial court. A party who raises an issue on appeal that was not raised in the trial court waives that issue. *Thompson v. Daviess–Martin County REMC* (1985), Ind.App., 486 N.E.2d 1102. Even absent waiver, we would not find that Mink had unclean hands. Winter argues Mink's hands were unclean because he voted to terminate Winter's salary from the joint venture effective March of 1987, and to give himself a raise. There was nothing to indicate Mink was dishonest with Winter or schemed behind his back. The joint venture was entered into with the idea that Winter would be retiring and out of the picture in 1987, and Mink's vote to terminate his salary in 1987 simply gave effect to that plan. Mink did not come before the court with unclean hands.

## VI. Damages.

Winter, Wraight, and Secrest next argue the court improperly resolved this case by awarding dissolution of the corporation and damages to Mink. There are three components to their argument: first, whether the court erred in awarding damages in addition to dissolution of the corporation; sec-

ond, whether the trial court erred in the amount of compensatory damages awarded in favor of Mink against Winter, Wraight, and Secrest; and third, whether the trial court erred in awarding punitive damages against Winter and Secrest.

■ The trial court found "[Mink] has sustained his burden of proving satisfaction of *Ind.Code* § 23–1–47–1 (1986)." *Record* at 518. IND.CODE 23–1–47–1 provides that the trial court may dissolve a corporation under certain circumstances including director or shareholder deadlock. The parties all agree W & W should have been dissolved under this section.[5] Winter, Wraight, and Secrest argue, however, that dissolution should have been the only remedy. They maintain it was error for the court to award Mink damages in addition to dissolving the corporation, and cite to *Gabhart, supra* for this proposition. As already discussed, *Gabhart* addressed the narrow question of whether shareholders in a corporation which has effected a merger are limited to appraisal rights, or whether they can petition for dissolution of the corporation. It does not hold that shareholders in a close corporation are prohibited from recovering compensatory damages when there has been a breach of the fiduciary duty owed to them. *See Hartung, supra* (upholding trial court's award of damages for breach of fiduciary duty).

■ Winter, Wraight, and Secrest argue the court erred in its computation of compensatory damages. "The purpose of damages is to award or impose a pecuniary compensation, recompense or satisfaction for an injury done or a wrong sustained by a party." *Indiana University v. Indiana Bonding & Surety Co.* (1981), Ind.App., 416 N.E.2d 1275, 1288, *trans. denied.* A New York court has held that when the basis of liability is a failure to conform to a fiduciary duty, the measure of damages is the entire loss sustained. *Clayton v. Farish* (1947), 191 Misc. 136, 73 N.Y.S.2d 727. A damage award does not require any spe-

---

5. We note the facts of this case do not fit precisely within the parameters of IND.CODE 23–1–47–1, but the parties do not contest the validity of the court-ordered dissolution, and we will not address it further.

cific degree of certainty, provided the amount awarded is supported by the evidence and is not based upon conjecture or speculation. *Potts v. Offutt* (1985), Ind. App., 481 N.E.2d 429. The award must be supported by probative evidence. *Persinger v. Lucas* (1987), Ind.App., 512 N.E.2d 865. A damage award will not be reversed upon appeal if it is within the scope of the evidence before the trial court. *Dunn v. Cadiente* (1987), Ind., 516 N.E.2d 52. In the present case, the trial court found Mink suffered $420,000 in compensatory damages. We must determine whether this finding is supported by the evidence. Again, we will disturb the trial court's findings only if the record is devoid of facts or inferences supporting the findings. *Craig, supra.*

■■■■■■ Mink testified at trial that $420,000 was the amount he would need to re-establish himself to the position he was in "prior to all of this...." *Record* at 961. He testified this amount of money was needed "[t]o start cold, acquiring product lines, beginning to market on brand new projects, beginning with the engineering on most of them with new product lines, there's a two year lag before income begins to cover expenses."[6] *Record* at 963. He also testified that $480,000 was the value of the joint venture had it continued through 1988, which did not happen due to the breaches of fiduciary duty. Winter, Wraight, and Secrest did not dispute these amounts at trial. In addition, Winter testified that in 1986, W & W was worth approximately $500,000. We cannot say the record is devoid of facts or inferences to support the trial court's finding as to the amount of Mink's damages. The trial court's finding that Mink suffered $420,000

in damages could have been based upon the evidence that the corporation was worth $500,000 prior to the breaches, that Mink should receive one·half of this amount, or $250,000, and that he should receive $170,-000 in damages due to the lost value of the joint venture. The damage award could have been based in part upon the trial court's findings, not contested by the parties, that since the filing of this action, Winter had received $113,015.97 from the corporation, and Mink had received $18,000. The damage award is supported by the evidence presented at trial, and we will not disturb the award.[7]

■■■■■■ Winter and Secrest next argue the trial court erred in assessing punitive damages against them. "To justify an award of punitive damages, there must be clear and convincing evidence which overcomes the presumption that the defendant's conduct was merely negligent or the result of some honest error." *Lazarus Department Store v. Sutherlin* (1989), Ind.App., 544 N.E.2d 513, 527, *trans. denied.* Punitive damages are recoverable upon clear and convincing evidence that the defendant acted with malice, fraud, gross negligence, or oppression which was not the result of mistake of law or fact, honest error of judgment, overzealousness, mere negligence or other human failing. *Id.* In reviewing an award of punitive damages, our inquiry is limited to determining whether the verdict is sustained by substantial evidence of probative value. *Dotlich, supra.* We cannot say the trial court erred in concluding Winter and Secrest's conduct was oppressive and malicious for the reasons that have been discussed thoroughly. Their acts in scheming and removing Mink

6. Winter, Wraight, and Secrest argue Mink could not receive more than one half of this amount because he only owned one half of W & W. Mink testified, however, that this amount was what it would take him, a 50% shareholder, to re-establish himself to his prior position, not the amount it would take W & W to re-establish itself.

7. We note the trial court did not err in awarding the corporation's assets directly to Mink in partial satisfaction of the judgment, in the interests of judicial economy and convenience to the

parties. Equity courts possess discretionary power to award damages in order to do complete justice, and the courts are able to adjust remedies in order to grant the necessary relief. *Walters v. Marathon Oil Co.,* 642 F.2d 1098 (7th Cir.1981). There was no reason to order W & W's assets split in half between Mink and Winter and then assess a judgment against Winter, Wraight, and Secrest, particularly in light of the breaches of fiduciary duty and the depletion of corporate assets by Winter since the filing of the action.

from the corporation solely so Winter could receive the amount of money he wanted upon his retirement do not constitute honest error of judgment; mistake or such other human failing.

## CONCLUSION

The judgment of the trial court is in all things affirmed.

RATLIFF, C.J., concurs.

MILLER, J., concurs with opinion.

MILLER, Presiding Judge, concurring.

I concur with the majority opinion. However, I note this is a case where findings of fact were requested and made pursuant to Trial Rule 52(B). In such a case, and where the findings are challenged as incomplete, we determine whether the findings support the judgment. Thus, it might seem strange to a reader of the majority opinion—at first blush—to see the majority depart from this standard of review and ignore the trial court's findings of fact when it discusses the court's award of $420,000. However, I further observe this deviation is simply because the appellants, in their briefs, attack the damage award as not being within the scope of the evidence.

Because appellants' argument on this issue was *based on the evidence presented at trial*, the majority responded by pointing out that appellants' interpretation of the evidence was not binding and other evidence presented at trial supported the trial court's judgment.

On appeal, we are only required to respond to the arguments raised and have done so in this case. Thus, we need not address the more narrow issue, not argued here, that the basic findings of the court—without regard to the evidence presented at trial—do not support the judgment.