Ronald **SMITH**, Appellant/Plaintiff,

v.

Clayton **POTTER**, Marianne Potter, Mercantile National Bank of Indiana, and Junior Clayton Potter, Jr. a/k/a Clayton Potter, Jr., Appellee/Defendants.

No. 56A04–9410–CV–394.

Court of Appeals of Indiana.

June 28, 1995.

Transfer Denied Nov. 22, 1995.

---

James M. Kapitan, Thomas E. Rucinski, Sachs & Hess, Hammond, for appellant.

William Barnard, Debra McVicker Lynch, Sommer & Barnard, P.C., Indianapolis, for appellees.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Ronald Smith appeals the trial court's judgment in favor of Marianne Potter and her stepson, Junior Clayton Potter, Jr. We affirm.

### ISSUE[1]

Whether the trial court's conclusion that Smith's failure to close the transaction in 1989 extinguished Mrs. Potter's obligation to convey the real estate to him was clearly erroneous.

### FACTS

In July 1989, Clayton Potter, Sr., and his wife, Marianne, entered into a real estate sales contract with Ronald Smith. Pursuant to the terms of the contract, the Potters agreed to sell Smith a parcel of land in Hammond, Indiana, for $150,000.00. Smith gave the Potters $15,000.00 as earnest money and agreed to pay the $135,000.00 balance at closing. The contract contained the following pertinent provisions:

Real Estate Sales Contract

4. Seller, at his own expense, agrees to furnish Purchaser a current plat of survey of the above real estate made, and so certified by the surveyor as having been

---

1. Smith raises two issues for our review. Because we affirm the first, we need not address whether Smith was entitled to specific performance.

made, in compliance with the Indiana Land Survey Standards.

5. The time of closing shall be on <u>1989</u> or on the date, if any, to which such time is extended by reason of paragraph 2 of the Conditions and Stipulations hereafter becoming operative (whichever is later), unless subsequently mutually agreed otherwise, at the office of *Chicago Title Ins.* or of the mortgage lender, if any, provided title is shown to be good or is accepted by the purchaser.

## Conditions and Stipulations

1. Seller shall deliver to Purchaser or Purchaser's agent, not less than 5 days prior to the time of closing, a title commitment for an owner's title insurance policy issued by the Chicago Title Insurance Policy in the amount of the purchase price.... The title commitment shall be conclusive evidence of good title therein....

2. If the title commitment discloses unpermitted exceptions, Seller shall have 30 days from the date of delivery thereof to have the exceptions removed from the commitment.... If the Seller fails to have the exceptions removed, or in the alternative, to obtain the commitment for title insurance ... Purchaser may terminate this contract or may elect, upon notice to Seller within 10 days after the expiration of the 30-day period, to take title as it then is with the right to deduct from the purchase price liens or encumbrances of a definite or ascertainable amount. If Purchaser does not so elect, this contract shall become null and void without further actions of the parties.

6. At the election of Seller or Purchaser upon notice to the other party not less than 5 days prior to the time of closing, this sale shall be closed through an escrow with Chicago Title and Trust Company, in accordance with the general provisions of the usual form of Deed and Money Escrow Agreement then in use by Chicago Title and Trust Company....

7. Time is of the essence of this contract. (R. 490).

In addition, the parties executed a rider to the contract which contains the following provisions:

1. With respect to the exact dimensions and location of the parcel of real estate which is the subject matter of the within contract, the parties agree that the exact location and dimensions thereof shall be determined by a survey to be paid for by Seller, but within the general parameters of the sketch attached to this agreement. Seller shall not be required to order such survey until Purchaser notifies Seller, in writing, that Purchaser waives the applicability of Paragraphs 4, 5, 7 and 8 of this Rider.

4. This contract is subject to the property being zoned for use for sale of petroleum and other products and Purchaser obtaining all necessary approvals and permits authorizing and allowing such development and use in accordance with the plans of Purchaser. This contract is further subject to Purchaser obtaining approval from governmental authorities allowing 40-foot pavement improvement on roadway (12th Street extended) on the southerly line of the property.

5. Purchaser shall have 60 days to obtain the approval and permits described in paragraph 4 above. If Purchaser does not notify Seller of his inability to obtain such approvals within 60 days, the provisions of paragraph 4 will be of no force and effect....

7. Purchaser shall have 60 days time to obtain any environmental tests or studies which Purchaser may desire, to be obtained at Purchaser's expense. Purchaser may declare this contract null and void if Purchaser is not satisfied with the results of such tests or studies for any reason, by serving Seller with a written notice of Purchaser's intention to declare this contract null and void, such notice to be mailed by Certified Mail not later than the 61st day following the date of this contract.

8. This contract is subject to the condition that Purchaser be able to procure within sixty (60) days a firm commitment for a loan to be secured by a mortgage or trust deed on the real estate.... If after making every reasonable effort Purchaser

is unable to procure such commitment within the time specified herein and so notified Seller thereof within that time, this contract shall become null and void....

(R. 490).

Because Smith wanted to obtain immediately the survey mentioned in provision number one of the rider, the parties' attorneys agreed that Smith would order the survey, and the Potters would reimburse him if the transaction closed. Smith obtained a survey of the property; however, it did not accurately reflect the parties' agreement.[2] Edward Bogucki, the Potter's attorney, notified Donald Arnell, Smith's attorney, that there was a problem with the survey. Arnell sent Bogucki another survey which included an easement. Bogucki contacted Arnell and told him that this survey was unacceptable as well. Arnell told Bogucki that he would look into the problem, but Bogucki never received another survey.

Clayton Potter, Sr., died in October 1989. Smith attended Potter's wake, and informed Potter's son, Junior Clayton Potter, Jr., that he was unsure whether the deal would close because of some environmental problems with the property. The Potters heard nothing further from Smith until January 1990, when Arnell phoned Bogucki and told him that Smith wanted to close the transaction. Bogucki told Arnell that the deal had terminated at the end of 1989, and that the Potters had not authorized him to resurrect it. Bogucki refused Arnell's request for a title insurance commitment.

Arnell obtained the title insurance commitment, and sent it to Bogucki. Further, Arnell attempted to schedule a closing date with Bogucki. Bogucki advised Arnell that Marianne Potter had obtained another attorney, William Tobin, to represent her. Arnell scheduled closing for April 16, and sent Tobin a letter advising him of the date. On April 16, Arnell and Smith appeared at the Chicago Title Insurance Company Office for the closing. Neither Mrs. Potter nor a representative attended. Mrs. Potter directed Bogucki to return Smith's earnest money on April 19, 1990. Smith then directed Arnell to return the earnest money to Bogucki. Bogucki placed the earnest money in an escrow account pending resolution of the matter.

In January 1990, Potter, Jr., had contacted Bogucki about the possibility of purchasing the property from his stepmother, Marianne. Marianne transferred the property to Potter, Jr., in July 1990.

On July 25, 1990, Smith filed a "Complaint for Specific Performance of Contract" against Potter, Sr., and Marianne. In 1991, Smith amended his complaint to include Potter, Jr., and Mercantile National Bank as defendants.[3] The trial court conducted a bench trial and found that 1) Smith's failure to close the transaction in 1989 extinguished the Potters' obligation to convey the real estate to him, and 2) Smith was not entitled to specific performance. Smith now appeals the trial court's decision.

## DECISION

At trial, the Potters requested that the trial court make special findings of fact and conclusions of law. When a party makes such a request pursuant to Ind.Trial Rule 52, our standard of review is well-settled. We first determine whether the evidence supports the findings. *W. & W. Equipment v. Mink* (1991), Ind.App., 568 N.E.2d 564, 569, *reh'g denied, trans. denied.* We then determine whether the findings support the judgment. *Id.* Special findings and the judgment flowing from them will be set aside only if they are clearly erroneous. *Id.* In determining whether the findings and judgment are clearly erroneous, this court will neither reweigh the evidence nor judge the credibility of witnesses. *Id.* We consider only the evidence in the record which supports the judgment along with the reasonable inferences which can be drawn therefrom. *Id.* We will not reverse unless the finding of the trial court was clearly against the logic and effect of the facts, or reasonable or probable deductions to be drawn therefrom. *National*

---

2. The survey failed to round off the corners of the property.

3. The trial court granted Clayton, Jr., and Marianne's motion to dismiss Clayton, Sr., as a defendant.

*Advertising v. Wilson Auto Parts* (1991), Ind.App., 569 N.E.2d 997. Further, because Smith's action to compel specific performance sounds in equity, particular deference must be given to the judgment of the trial court. *See, Donavan v. Ivy Knoll Apartments Partnership* (1989), Ind.App., 537 N.E.2d 47, 50.

■ Here, the trial court made the following pertinent conclusions of law:

3. Because the contract between Smith and the Potters specified a time for closing and contained a provision that tie (sic) was of the essence, Mr. Smith's failure to close the transaction in 1989 extinguished any obligation on the part of the Potters to convey the real estate to him. . . .

6. The Potter (sic) did not breach the contract provision requiring them to obtain a title commitment.

7. The (sic) did not waive their right to enforce the 1989 closing deadline by virtue of any failure to perform their obligations under the contract.

(R. 463–64). Smith argues that these conclusions are "clearly in error." Smith's Brief, p. 20. Although our research reveals no clear precedent in Indiana case law which supports the trial court's conclusions,[4] we must disagree with Smith's contentions.

In *Nadeau v. Beers,* (1968), 73 Wash.2d 608, 440 P.2d 164, *reh'g denied,* the Washington Supreme Court held that when an agreement makes time of the essence, fixes a termination date, and there is no conduct giving rise to estoppel or waiver, the agreement becomes legally defunct upon the stated termination date if performance is not tendered. *Id.* 440 P.2d at 165. *See also,* 91 C.J.S. *Vendor and Purchaser* Section 99 (1955) ("If a time for performance is specified and time is of the essence of the contract, a strict performance in point of time is necessary unless waived.")

■ Here, the contract specifically made time of the essence,[5] and set a closing date for December 31, 1989, at the latest. Further, the trial court concluded that the Potters "did not waive their right to enforce the 1989 closing deadline by virtue of any failure to perform their obligations under the contract." (R. 464). The trial court's conclusion that Smith's failure to close the transaction in 1989 extinguished the Potters' obligation to convey the real estate to him was not clearly erroneous.

Nevertheless, Smith argues that a seller's obligation to provide a survey or a title insurance commitment is a condition precedent to a real estate contract. According to Smith, "a seller who fails to provide title insurance may not rescind the contract or defeat the purchaser's action to compel specific performance of the contract." Smith's Brief, p. 21. Smith further argues that "[b]ecause Marianne failed to satisfy these conditions precedent, she cannot now excuse her performance under the contact by alleging that Ronald failed to close on the sale during 1989." Smith's Brief, p. 23. In support of his proposition, Smith directs us to *Dullanty v. Comstock Development Corporation* (1980), 25 Wash.App. 168, 605 P.2d 802.

In *Dullanty,* on April 20, 1975, Dullanty offered to purchase an unimproved lot from Comstock Development Corporation. The earnest money agreement described the property (Lot 28), the price and the manner of payment. The purchase price was $8,287.50, payable in part as follows:

$200.00 Earnest money accepted above to be applied to the down payment.

---

**4.** Indiana cases discussing time of the essence clauses provide that courts do not generally view time as being of the essence of a contract unless the terms of the contract or the conduct of the parties make it so. *Donavan, supra,* at 51. Accordingly, a party to a contract can prove time to be of the essence either by 1) the terms of the instrument or 2) evidence of circumstances establishing that the parties intended time as the controlling element of the contract. *Id.* However, the issue presented by the facts before us has not been addressed.

**5.** The trial court further concluded that:

5. Although unnecessary because the contract unambiguously made time of the essence, the uncontroverted evidence of the parties' intent demonstrates that they intended time to be of the essence.

(R. 464). The record supports the trial court's conclusion. Smith was aware that Potter, Sr. 1) needed cash from the transaction to purchase another parcel of land, and 2) wanted to close the transaction in 1989 for tax purposes.

$628.75 Further down payment to be paid in cash at closing which will be no later than 30 days after the paving and curbing is finished.

*Id.* 605 P.2d at 803. The paving and curbing was completed sometime in the Spring of 1975; however, neither party took any steps to close the sale until approximately two years later. Throughout this time, Dullanty was actively engaged in the construction of other new homes in the Comstock Development. Further, Dullanty worked closely with the James S. Black Real Estate Company, the same company which had prepared the earnest money agreement.[6]

In July 1977, Dullanty submitted architectural plans for Lot 28. At that time, Black informed Dullanty that Comstock would not sell the lot for the price stated in the original agreement, but would consider a sale for approximately double the price. On August 5, 1977, Dullanty offered to tender the remaining balance of the original purchase price in exchange for a warranty deed and title policy. Black advised Dullanty that a Comstock representative had informed him that the agreement had terminated due to the two year delay in closing. Dullanty commenced an action for specific performance, which the trial court dismissed after finding that Dullanty had failed to satisfy his burden of closing the transaction.

On appeal, the Washington Court of Appeals found that under the terms of the parties' agreement, Comstock's obligation to procure a policy of title insurance was a condition precedent to Dullanty's obligation to perform under the contract. The court further found that the parties were in close contact in their respective efforts to develop the Comstock Park addition during the two year period following the execution of the earnest money agreement. According to the court, "[w]hile the contract stated that time was of the essence, the inaction of the parties was indicative of some understanding of a waiver of the essence clause." *Id.* 605 P.2d at 805. The court found that "[u]nder these circumstances, Mr. Dullanty did not forfeit his rights under the earnest money agree-

ment by awaiting the performance of a condition precedent by Comstock." *Id.*

■ The circumstances in *Dullanty* are not present in the facts before us. Here, Smith and the Potters were not in close contact during the six month period following the execution of the purchase agreement. The final contact between the parties occurred in October 1989, at Potter, Sr.'s wake. At that time, Smith told Potter, Jr. that he was unsure whether the deal would close due to some environmental problems with the property. The Potters heard nothing further from Smith until January 1990. The lack of close contact between the parties in conjunction with Smith's statement to Potter, Jr. two months prior to the scheduled closing date is quite different from the situation in *Dullanty* where the parties were in close contact with no indication from either party that the deal might not close. Here, the Potter's and Smith's conduct was not indicative of an understanding that the time is of the essence clause had been waived.

Affirmed.

CHEZEM and RILEY, JJ., concur.

---

6. James S. Black was also the President of Com-

stock Development Corporation.